FILED TPA INTAKE USBC
17 DEC 2024 PM3:51

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:                                                          Chapter 7

JULIETA LAROSA,                                                 Case No. 8:24-bk-03038-RCT

        Debtor.

-------------------------------------------/

**MOTION FOR RECONSIDERATION ON ORDER GRANTING, IN PART, AMENDED MOTION TO COMPEL CHRISTOPHER ARMSTRONG'S RULE 2004 EXAMINATION DUCES TECUM AND FOR SANCTIONS (DOC 63)**

Christopher Armstrong ("Armstrong"), without legal counsel, requests this court to reconsider the aforementioned order filed 11/21/2024.

## INTRODUCTION

During a short hearing, conducted on November 19, 2024, commencing at approximately 9:30 am, Armstrong objected the amended motion to compel (doc 54) filed by Breakthrough Coatings, Inc. ("Breakthrough"). The court heard arguments of both parties, and subsequently issued a ruling. However, the ruling appears to be vague and ambiguous as far as which request(s) Armstrong is required to respond to, as it was understood by Armstrong, that Breakthrough was required to issue a new set of document requests. If Armstrong fathomed the statement by the judge in open court correctly, then Breakthrough failed to honor this courts request. Armstrong also voiced concerns that he did not trust Breakthrough, as they have lied in court before. Additionally, Armstrong requests this motion for reconsideration due to order 3, which states Armstrong shall provide Breakthrough with three dates of availability to appear for an examination. Armstrong does not recall a conversation regarding an in person examination during the hearing, nor can Armstrong reasonably afford a day away from work to attend a frivolous examination, based strictly on the contention that Armstrong has visited pawn shops with the debtor, in attempts to sell a diamond ring. This assertion has not, and could not possibly be confirmed with any amount of proof, as it never happened. Furthermore, because Jason LaRosa is such a terrible father, see **EXHIBIT F,** both of his children are now living with Armstrong, increasing his daily living costs, necessitating his need to work. Essentially, this is yet another form of harassment by Breakthrough and a 'fishing experiment' attempted to be used at a later date in the civil proceedings, held in Massachusetts and Florida.

## RELEVANT FACTUAL ALLEGATIONS

1) Raymond Tomlinson has been appearing 'pro hac vice' in Florida, as he is not licensed to practice here, for the entire duration of the Florida proceedings, commencing in Dec 2022, without fulfilling his financial obligations to the state by paying the associated fees. Tomlinson, through the assistance of Shutts and Bowen LLC, has skated his way under the radar for two (2) years, unscathed, wreaking havoc throughout the entire Florida litigation, including the debtor's bankruptcy. See **EXHIBIT A**. Tomlinson also informed the Judge in Massachusetts he would not be medically cleared for trial for at least 6 (six) months and requested an extension, then 4 (four) days later, flew down to Florida and testified here. Tomlinson has also been accused by Massachusetts attorney Travis Jacobs of essentially money laundering for Jason LaRosa, and circumventing a court order, to which the bookkeeper somewhat testified to. See **EXHIBIT B.** From lying under oath, see **EXHIBIT C**, to facilitating false proof of claim forms for Jason LaRosa and Breakthrough, see **PROOF OF CLAIMS REGISTER,** this individual acts as if he has omnipotent power.

2) Harris J. Koroglu has furnished this court with a voluminous amount of unwarranted documents to illegally stimulate Breakthroughs interest in the debtor's estate in a desperate attempt to gain priority. Koroglu, knowingly and willfully provided documents to this court to indicate a debt of $797,656.16. See POC No. 13. However, POC No. 13 is riddled with falsities and 'pre-judgment hopes'. For example, the $150,xxx claimed is owed back to PayPal for Breakthrough, is a bold-faced lie. First off, neither proceedings, Florida or Massachusetts, or any other state for that matter, has issued a judgment compelling the debtor to return funds. In fact, those funds were allocated to the debtors 2021 K1 form as income. See **EXHIBIT D**. The debtor was subsequently responsible for the tax liability that followed. On a side note, the debtor transferred those funds based on breakthroughs former bookkeeper's recommendation. Unbeknownst to the court, but well known amongst Breakthrough attorneys, Jason LaRosa 'followed suit'. The claim of the remaining $647,xxx is also extremely fabricated, to say the least. The only 'leg to stand on' Breakthrough has is an order from Judge Huey stating (1) "Plaintiff is hereby entitled to Final Judgment in Replevin against Ms. LaRosa which will be entered by a separate order." (2)" Plaintiff is entitled to recover from Ms. LaRosa the Plaintiff's costs and reasonable attorneys' fees incurred in connection with these proceedings. The Court hereby reserves jurisdiction to determine the amount of same." Neither of these statements indicate a determined amount owed, nor has there been any orders following this, as the case went to the appellate court. Therefore, as of the petition date, Breakthrough was not entitled to any monetary relief. See **EXHIBIT E.**

3) Jason LaRosa has no claim as a creditor. He is not a plaintiff in Florida, which is the only state to issue a judgment related to monetary compensation. Massachusetts has not made or even slightly indicated any type of final or presumptuous financial agreement. Breakthrough's attorneys know this, but were still willing to attempt to circumvent the law, regarding but not limited to, bankruptcy. Not only that, but his personal claim of $25,000.00 is preposterous.

Three years into litigation and he hasn't spoken of this yet, or reported the theft to local and/or out of state police. The remainder of his claim is related to lawyer fees, which he clearly is not entitled to.

4) Tomlinson and Koroglu reached out to Christine L. Herendeen, who was appointed as chapter 7 Trustee (trustee). During their conversation(s), they manipulated the trustee and convinced her that the debtor was not actually a legitimate 50% owner of Breakthrough. They convinced the trustee the debtor obtained 50% ownership through forceful and illegal means. The debtors Massachusetts counsel spoke with the trustee, informed her she had been misinformed, then proceeded to furnish documents proving the misinformation; which documents appear to have been disregarded, only to prove the amount of lies Tomlinson and Koroglu told her outweighs the proof on her personal scale. Attorney Travis Jacobs, of The Jacobs Law Firm will attest to this. Also, if requested, he will write and sign an affidavit confirming the aforementioned.

### CONCLUSION

In summary, there has been a copious amount of newly discovered and produced evidence (see attached) regarding this case. Clearly, Breakthrough, and their team of lawyers will stop at nothing to attempt to bring Armstrong and the debtor down. At this honorable courts discretion, there lies the potential for a bankruptcy fraud case against Mr. LaRosa, Mr. Tomlinson, and Mr. Koroglu.

/s/ Christopher Armstrong
Christopher Armstrong

# EXHIBIT A

**IN THE CIRCUIT/COUNTY COURT OF THE THIRTEENTH JUDICIAL CIRCUIT, IN AND FOR HILLSBOROUGH COUNTY, FLORIDA**

CASE NUMBER: 22-CA-009745 Division C

Breakthrough Coatings Inc. vs Armstrong, Christopher R

ALEKSEY SHTIVELMAN
SHUTTS AND BOWEN LLP
200 S BISCAYNE BLVD STE 4100
MIAMI FL 33131

## NOTIFICATION AND/OR REQUEST FOR FEES - PRO HAC VICE

Pursuant to Florida Statute 28.241 upon an attorney appearing PRO HAC VICE, the Clerk shall collect an additional fee of $100.00 to be deposited into the General Revenue Fund.

Please submit $100.00 to the Clerk of Courts, Hillsborough County for the PRO HAC VICE fee.

Dated: December 5, 2022.

Cindy Stuart,
Clerk of Circuit Court

Luis Jimenez, Deputy Clerk
22-CA-009745 12/5/2022 8:15:27 AM

CC: Court File

IN THE CIRCUIT COURT OF THE
13TH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.  Court Case #: 22-CA-009745

BREAKTHROUGH COATINGS INC.,

   Plaintiff,

v.

CHRISTOPHER R. ARMSTRONG, and
JULIETA R.LAROSA,

        Defendants.

_____/

## VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510

Comes now Raymond H. Tomlinson, Jr., Movant herein, and respectfully represents the following:

1.     Movant resides in East Sandwich, Massachusetts.

2.     Movant is not a resident of the State of Florida.

3.     Movant is an attorney and a member of the law firm of TOMLINSON | LAW, with offices at 1170 Main Street, Suite #1, West Barnstable, MA 02668.

4.     Movant has been retained personally or as a member of the above named law firm on December 7, 2021 by Plaintiff, BREAKTHROUGH COATINGS, INC. ("Plaintiff") to provide legal representation in connection with an action in the Superior Court of Barnstable County of the Commonwealth of Massachusetts styled *Breakthrough Coatings Inc., et al. v. Julieta R. LaRosa etc., et als.*, Civil Action No. 2172CV00436 (the "Massachusetts Proceeding"), and the

above captioned ancillary *in rem* action, now pending before the above-named court of the State of Florida.

5.    Movant is an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Massachusetts | Bar No. 654855 |
| United States District Court for the District of Massachusetts | Bar No. 654855 |
| U.S. Court of Appeals for the First Circuit | Bar No. 125068 |

6.    There have been no disciplinary, suspension, disbarment, or contempt proceedings initiated against Movant in the preceding 5 years.

7.    Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

8.    Movant is not an inactive member of The Florida Bar.

9.    Movant is not now a member of The Florida Bar.

10.    Movant is not a suspended member of The Florida Bar.

11.    Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation or disciplinary revocation from The Florida Bar.

12.    Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510.

13.    Movant has not filed any motion to appear as counsel in Florida state courts during the past five (5) years.

14.    Local counsel of record associated with Movant in this matter are Aleksey Shtivelman (Florida Bar No. 99159) and Aliette D. Rodz (Florida Bar No. 173592) who are both

2

active members in good standing of The Florida Bar and have offices at SHUTTS & BOWEN

LLP, 200 S. Biscayne Boulevard, Suite 4100, Miami, Florida, 33131, and telephone number (305)

358-6300.

15.    Movant has read the applicable provisions of Florida Rule of Judicial

Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that

this verified motion complies with those rules.

16.    Movant agrees to comply with the provisions of the Florida Rules of Professional

Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

Dated: November 22, 2022.                  Respectfully submitted,

                                           TOMLINSON | LAW

                                           Raymond H. Tomlinson, Jr.,
                                           Massachusetts Bar (BBO)# 654855
                                           TOMLINSON | LAW
                                           1170 Main Street, Suite 1
                                           West Barnstable, MA  02668
                                           Telephone: (508) 348-9030
                                           Facsimile: (508) 422-0930
                                           rht@tomlinsonlaw.com
                                           *Movant seeking Pro Hac Vice Admission*

STATE OF MASSACHUSETTS
CITY OF WEST BARNSTABLE

## VERIFICATION

I verify under penalty of perjury that I am the Movant in the above-styled matter; that I

have read the foregoing Motion and know the contents thereof, and the contents are true and

correct.

                                           Raymond H. Tomlinson, Jr.,

3

## CONSENT OF LOCAL COUNSEL

I hereby consent to be associated as local counsel of record in this cause pursuant to

Florida Rule of Judicial Administration 2.510.

Dated: December 1, 2022.                              Respectfully submitted,

By: */s/ Aleksey Shtivelman*
Aleksey Shtivelman
Florida Bar No. 99159
ashtivelman@shutts.com
Aliette D. Rodz
Florida Bar No. 173592
arodz@shutts.com
**SHUTTS & BOWEN LLP**
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida, 33131
(305) 358-6300
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing motion is contemporarily served

to PHV Admissions. Payment of $250.00 filing fee has been made online to The Florida Bar

Members Portal and upon all counsel of record by CM/ECF electronic filing.

TOMLINSON | LAW

*Raymond H. Tomlinson, Jr.*
Raymond H. Tomlinson, Jr.,
Massachusetts Bar (BBO)# 654855
*Movant seeking Pro Hac Vice Admission*

4

Thank you.

**The Florida Bar**
651 E. Jefferson St.
Tallahassee FL 32399
United States
(850) 561-5600
http://www.Floridabar.org

 THE FLORIDA BAR
MEMBER PORTAL

# THANK YOU!

| | |
|---|---|
| Date: | 12/1/2022 |
| Receipt Number: | 0000870236 |
| Payment Method: | VISA **2059 (10/2026) |
| Amount: | $250.00 |

Sold To:

**Aleksey Shtivelman**
Mr. Aleksey Shtivelman
200 S Biscayne Blvd Ste 4100
Miami FL 33131-2362

| QTY | Description | Unit Price | Sale Price | Line Total |
|---|---|---|---|---|
| 1 | **Pro Hac Vice or Verified Statement Filing Fee** *Pro Hac Vice or Verified Statement Filing Fee* | $250.00 | $250.00 | $250.00 |
| | | | TOTAL ITEMS: | $250.00 |
| | | | **TOTAL PAID:** | **$250.00** |



IN THE CIRCUIT COURT OF THE
13TH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. Court Case #: 22-CA-009745

BREAKTHROUGH COATINGS INC.,

    Plaintiff,

v.

CHRISTOPHER R. ARMSTRONG, and
JULIETA R.LAROSA,

        Defendants.

_____/

## ORDER GRANTING VERIFIED MOTION OF RAYMOND H. TOMLINSON, JR. TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510

THIS CAUSE came before the Court upon Raymond H. Tomlinson, Jr.'s Verified Motion

for Admission to Appear Pro Hac Vice Pursuant to Florida Rule of Judicial Administration 2.510

(the "Motion"), as counsel for Plaintiff, BREAKTHROUGH COATINGS, INC. ("Plaintiff"). The

Court has reviewed the Motion and the court record and is otherwise fully advised in the premises.

Therefore, it is –

**ORDERED AND ADJUDGED** that Raymond H. Tomlinson, Jr.'s Verified Motion for

Admission to Appear Pro Hac Vice Pursuant to Florida Rule of Judicial Administration 2.510 is

**GRANTED.** Raymond H. Tomlinson, Jr. is admitted to appear *pro hac vice* in this case as

additional counsel for Plaintiff.

**DONE AND ORDERED** this _____ day of _____, 2022.

_____
HON. PAUL L. HUEY
CIRCUIT COURT JUDGE

Conformed Copies Furnished to: all counsel of record.

2

12:57

Transaction Fee                                    ✕

| Fee | Charge |
|---|---|
| MOTION FOR ADMISSION PRO HAC VICE | $100.00 |

Close

hover.hillsclerk.com



# Case Information

| Icon Keys | Summary | Parties | Events | Judgments |

| Case Options & Payments | Hearings | Financial | File Location | Related Cases |

## $ Financial Summary

| Column visibility | Excel |
| CSV |

Search: [                    ]

| Select | Account Type | Party Name | Party Type | Current Due | Last Activity | Payment Plan |
|--------|--------------|------------|------------|-------------|---------------|--------------|
| | Costs, Fines, and Fees | Breakthrough Coatings Inc., . | Plaintiff | $100.00 | 12/22/2022 | N |

| Fees | Fee Transactions |

Party Name:Breakthrough Coatings Inc., .

Party Type:Plaintiff

### Financial Fee Summary

| Column visibility | Excel |
| CSV |

| Category | Charges | Payments | Credits | Balance | Disbursement |
|---|---|---|---|---|---|
| **FILING FEE 05** | **$11.00** | **$11.00** | **$0.00** | **$0.00** | **$0.00** |
| **FILING FEE 10** | **$274.00** | **$274.00** | **$0.00** | **$0.00** | **$0.00** |
| **FILING FEE 15** | **$301.00** | **$201.00** | **$0.00** | **$100.00** | **$0.00** |
| **SERVICE CHARGES PRIORITY 05** | **$40.00** | **$40.00** | **$0.00** | **$0.00** | **$0.00** |
| **SERVICE CHARGES PRIORITY 10** | **$7.50** | **$7.50** | **$0.00** | **$0.00** | **$0.00** |

Financial Fee Distribution

Column visibility    Excel

CSV

| Category | Financial Category | Charges | Payments | Balance |
|---|---|---|---|---|
| **FILING FEE 05** | | **$11.00** | **$11.00** | **$0.00** |
| | R413 DOR ADDL REV CHP 2008-111 | $1.00 | $1.00 | $0.00 |
| | R413 DOR ADDL REV CHP 2008-111 | $10.00 | $10.00 | $0.00 |
| **FILING FEE 10** | | **$274.00** | **$274.00** | **$0.00** |
| | CA-R131 FILING FEE - CIRCUIT CIVIL | $115.00 | $115.00 | $0.00 |
| | 8437 DOR DFS ADMIN TF EDUC 28.241(1)(a) | $4.00 | $4.00 | $0.00 |

|  | | | |
|---|---|---|---|
| CA-8401 FILING FEE 1ST $80 28.241 | $80.00 | $80.00 | $0.00 |
| CA-R111 CIR CIV-ADD FILE FEE 28.241 1A | $75.00 | $75.00 | $0.00 |
| **FILING FEE 15** | **$301.00** | **$201.00** | **$100.00** |
| 8436 CIVIL ACTION 28.241(1)(a)1.a. | $195.00 | $195.00 | $0.00 |
| 8402 DOR DFS ADMIN TF EDUC 28.241(1)(a)1.a/b | $1.00 | $1.00 | $0.00 |
| 8382 COURT ED TF 28.241(1)(a)1.c CIR CVL | $3.50 | $3.50 | $0.00 |
| 8377 DOR DFS 28.241 (1)(a) CIR CVL | $0.50 | $0.50 | $0.00 |
| 8365 STATE COURTS REVENUE TRUST FUND FS 44.108 (1) | $1.00 | $1.00 | $0.00 |
| 6158 Attorney Pro Hac Vice Fee 28.241(6) | $100.00 | $0.00 | $100.00 |
| **SERVICE CHARGES PRIORITY 05** | **$40.00** | **$40.00** | **$0.00** |
| R114 ISSUING A SUMMONS | $20.00 | $20.00 | $0.00 |
| R114 ISSUING A SUMMONS | $20.00 | $20.00 | $0.00 |
| **SERVICE CHARGES PRIORITY 10** | **$7.50** | **$7.50** | **$0.00** |
| CA-R112 CIR CIVIL-BOND APPROVAL FEE 28.24(19) | $7.50 | $7.50 | $0.00 |

 Indicates document is ready to be viewed

 Displays additional event information

 Indicates document needs redaction review prior to public viewing

 Indicates document is undergoing redaction

 Indicates document is sealed by the Court Order or Confidential by Court rule. Image cannot be viewed

 Click to purchase electronically certified copies of documents

 Image Pending Review

If No Image Appears there is either no image available or document has not been converted to electronic image.

 Exit Case Details



© 2023- Hillsborough County Clerk of Court and Comptroller



# Case Information

Icon Keys    Summary    Parties    Events

Judgments    Case Options & Payments    Hearings

Financial    File Location    Related Cases

## Financial Summary

Search: [                    ]

| Select | Account Type | Party Name | Party Type | Current Due | Last Activity |
|--------|--------------|------------|------------|-------------|---------------|
|  | Costs, Fines, and Fees | Breakthrough Coatings Inc., . | Plaintiff | $100.00 | 12/22/2022 |

### Fees | Fee Transactions

Party Name:Breakthrough Coatings Inc., .

Party Type:Plaintiff

#### Financial Fee Summary

| Category | Charges | Payments | Credits | Balance | Disbursemen |
|----------|---------|----------|---------|---------|-------------|
| FILING FEE 05 | $11.00 | $11.00 | $0.00 | $0.00 | $0.0( |
| FILING FEE 10 | $274.00 | $274.00 | $0.00 | $0.00 | $0.0( |
| FILING FEE 15 | $301.00 | $201.00 | $0.00 | $100.00 | $0.0( |

| Select | Account Type | Party Name | Party Type | Current Due | Last Activity |
|---|---|---|---|---|---|

| Category | Charges | Payments | Credits | Balance | Disbursemen |
|---|---|---|---|---|---|
| SERVICE CHARGES PRIORITY 05 | $40.00 | $40.00 | $0.00 | $0.00 | $0.0( |

Financial Fee Distribution

| Category | Financial Category | Charges | Payments | Balance |
|---|---|---|---|---|
| FILING FEE 05 | | $11.00 | $11.00 | $0.0( |
| | R413 DOR ADDL REV CHP 2008-111 | $10.00 | $10.00 | $0.0( |
| | R413 DOR ADDL REV CHP 2008-111 | $1.00 | $1.00 | $0.0( |
| FILING FEE 10 | | $274.00 | $274.00 | $0.0( |
| | 8437 DOR DFS ADMIN TF EDUC 28.241(1)(a) | $4.00 | $4.00 | $0.0( |
| | CA-R131 FILING FEE - CIRCUIT CIVIL | $115.00 | $115.00 | $0.0( |
| | CA-R111 CIR CIV-ADD FILE FEE 28.241 1A | $75.00 | $75.00 | $0.0( |

| Select | Account Type | Party Name | Party Type | Current Due | Last Activity |
|---|---|---|---|---|---|
| | **Category** | **Financial Category** | **Charges** | **Payments** | **Balance** |
| | | CA-8401 FILING FEE 1ST $80 28.241 | $80.00 | $80.00 | $0.0( |
| | **FILING FEE 15** | | **$301.00** | **$201.00** | **$100.0(** |
| | | 8402 DOR DFS ADMIN TF EDUC 28.241(1) (a)1.a/b | $1.00 | $1.00 | $0.0( |
| | | 8436 CIVIL ACTION 28.241(1) (a)1.a. | $195.00 | $195.00 | $0.0( |
| | | 8365 STATE COURTS REVENUE TRUST FUND FS 44.108 (1) | $1.00 | $1.00 | $0.0( |
| | | 8377 DOR DFS 28.241 (1)(a) CIR CVL | $0.50 | $0.50 | $0.0( |
| | | 8382 COURT ED TF 28.241(1)(a)1.c CIR CVL | $3.50 | $3.50 | $0.0( |
| | | 6158 Attorney Pro Hac Vice Fee 28.241(6) | $100.00 | $0.00 | $100.0( |

| Select | Account Type | Party Name | Party Type | Current Due | Last Activity |
|---|---|---|---|---|---|

| | | Category | Financial Category | Charges | Payments | Balance |
|---|---|---|---|---|---|---|
| | | SERVICE CHARGES PRIORITY 05 | | $40.00 | $40.00 | $0.00 |

 Indicates document is ready to be viewed

 Displays additional event information

Indicates document needs redaction review prior to public viewing

Indicates document is undergoing redaction

 Indicates document is sealed by the Court Order or Confidential by Court rule. Image cannot be viewed

Click to purchase electronically certified copies of documents

Image Pending Review

If No Image Appears there is either no image available or document has not been converted to electronic image.

Exit Case Details

 

© 2024- Hillsborough County Clerk of Court and Comptroller

## Transaction Fee

| Fee | Charge |
|---|---|
| **MOTION FOR ADMISSION PRO HAC VICE** | **$100.00** |

 Financial Summary

Close

Search: [                    ]

| Select | Account Type | Party Name | Party Type | Current Due |
|---|---|---|---|---|
| | Costs, Fines, and Fees | Breakthrough Coatings Inc., . | Plaintiff | $100.0 |

**Fees** | **Fee Transactions**

Party Name:Breakthrough Coatings Inc.

Party Type:Plaintiff

| Trans ID | Trans Date | Description | Receipt | Payer |
|---|---|---|---|---|
| 37213890 | 11/21/2022 | Transaction Assessment | | |
| 37213891 | 11/21/2022 | ACH Payment | 21-00948262 | Shutts Bowen LLP |
| 37225456 | 11/28/2022 | Transaction Assessment | | |
| 37225596 | 11/28/2022 | Credit Card | 24-00976378 | GIVENS LEE |
| 37248703 | 12/05/2022 | Transaction Assessment | | |



## Transaction Fee

| Fee | Charge |
| --- | --- |
| **MOTION FOR ADMISSION PRO HAC VICE** | **$100.00** |

Close

Indicates document is ready to be viewed

Displays additional event information

Indicates document needs redaction review prior to public viewing

Indicates document is undergoing redaction

Indicates document is sealed by the Court Order or Confidential by Court rule. Image cannot be viewed

Click to purchase electronically certified copies of documents

Image Pending Review

If No Image Appears there is either no image available or document has not been converted to electronic image.

Exit Case Details

 

© 2024- Hillsborough County Clerk of Court and Comptroller



# Case Information



| | Icon Keys | | Summary | | Parties | | Events |
|---|---|---|---|---|---|---|---|
| | Judgments | | Case Options & Payments | | Hearings | | |
| | Financial | | File Location | | Related Cases | | |

## Case Options & Payments

Judge:      *Huey, Paul. L*
Division:   *Division I*

| Party Name | Party Type | Current Due | Last Activity | Pay |
|---|---|---|---|---|
| Breakthrough Coatings Inc. | Plaintiff | $100.00 | 12/22/2022 | $ |
| Armstrong, Christopher R | Defendant | $0.00 | 03/06/2024 | |
| LaRosa, Julieta R | Defendant | $0.00 | | |
| CHASE BANK | Garnishee | $0.00 | | |
| TD BANK N A | Garnishee | $0.00 | | |

Subscribe to receive notifications for case number  22-CA-009745    [ Subscribe ]

 Indicates document is ready to be viewed

Displays additional event information

Indicates document needs redaction review prior to public viewing

Indicates document is undergoing redaction

Indicates document is sealed by the Court Order or Confidential by Court rule. Image cannot be viewed

 Click to purchase electronically certified copies of documents

 Image Pending Review

If No Image Appears there is either no image available or document has not been converted to electronic image.

 Exit Case Details

 

© 2024- Hillsborough County Clerk of Court and Comptroller

ca:
Pa

Sign In

Search all cases and statutes...                    JX

Statutes, codes, and regulations

Florida Court Rules

[...]

ATTORNEYS

# Fl. R. Gen. Prac. Jud. Admin. 2.510

⬇ Download

As amended through November 4, 2024

Rule 2.510 - FOREIGN ATTORNEYS

(a) **Eligibility.** Upon filing a verified motion with the court, an attorney who is an active member in good standing of the bar of another state and currently eligible to practice law in a state other than Florida may be permitted to appear in particular cases in a Florida court upon such conditions as the court may deem appropriate, provided that a member of The Florida Bar in good standing is associated as an attorney of record. The foreign attorney must make application in each court in which a case is filed even if a lower tribunal granted a motion to appear in the same case. In determining whether to permit a foreign attorney to appear pursuant to this rule, the court may consider, among other things, information provided under subdivision (b)(3) concerning discipline in other jurisdictions. No attorney is authorized to appear pursuant to this rule if the attorney (1) is a Florida resident, unless the attorney has an application pending for admission to The Florida Bar and

has not previously been denied admission to The Florida Bar; (2) is a member of The Florida Bar but is ineligible to practice law; (3) has previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation permitted pursuant to this rule provided, however, the contempt is final and has not been reversed or abated; (4) has failed to provide notice to The Florida Bar or pay the fees described in the Rules Regulating The Florida Bar concerning non-Florida lawyers' appearances in a Florida court; or (5) is engaged in a "general practice" before Florida courts. For purposes of this rule, more than 3 appearances within a 365-day period in separate cases shall be presumed to be a "general practice." Appearances at different levels of the court system in the same case shall be deemed 1 appearance for the purposes of determining whether a foreign attorney has made more than 3 appearances within a 365-day period. In cases involving indigent or pro bono clients, the court may waive the fees for good cause shown. This rule shall not affect the eligibility of a foreign attorney to appear in a Florida court when authorized by federal law.

(b) **Contents of Verified Motion.** A form verified motion accompanies this rule and must be utilized by the foreign attorney. Within 10 days of discovering any information which is different than the representations made in the verified motion, the foreign attorney must supplement the motion with the new information. The supplemental information must be filed with the court and The Florida Bar. The obligation to supplement the motion exists until the motion is denied or the foreign attorney is no longer counsel in the case. The verified motion required by subdivision (a) must include:

(1) a statement identifying all jurisdictions in which the attorney is an active member in good standing and currently eligible to practice law, including all assigned bar numbers and attorney numbers, for which a certificate of good standing is not required;

(2) a statement identifying by date, case name, and case number all other matters in Florida state courts in which pro hac vice admission has been sought in the preceding 5 years, including any lower tribunals for the case in which the motion is filed, and whether such admission was granted or denied;

(3) a statement identifying all jurisdictions in which a judicial officer or the entity responsible for attorney regulation:

(A) initiated disciplinary, suspension, disbarment, or contempt proceedings against the attorney in the preceding 5 years including the date on which the proceeding was initiated, the nature of the alleged violation, and the result of the proceeding including any sanction, or;

(B) disciplined, suspended, disbarred, or held in contempt the attorney in the preceding 5 years including the date on which the sanction was entered and the nature of the violation;

(4) a statement identifying the date on which the legal representation at issue commenced, and the party or parties represented;

(5) a statement that all applicable provisions of these rules and the Rules Regulating The Florida Bar have been read, and that the verified motion complies with those rules;

(6) the name, record bar address, and membership status of the Florida Bar member or members associated for purposes of the representation;

(7) a certificate indicating service of the verified motion upon The Florida Bar and all counsel of record in the matter in which leave to appear pro hac vice is sought and payment of the fees described in the Rules Regulating The Florida Bar concerning non-Florida lawyers appearances in a Florida court or notice that the movant has requested a judicial waiver of said fees; and

(8) a verification by the attorney seeking to appear pursuant to this rule and the signature of the Florida Bar member or members associated for purposes of the representation.

IN THE _____COURT OF

THE _____ JUDICIAL

CIRCUIT,

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, SS.                    SUPERIOR COURT DEPARTMENT
                                   CIVIL ACTION NO.: 2172CV00436

BREAKTHROUGH COATINGS, INC., AND    )
JASON LAROSA, INDIVIDUALLY,         )
                                    )
          Plaintiffs,               )
                                    )
v.                                  )
                                    )    **EMERGENCY MOTION**
JULIETA R. LAROSA, CHRISTOPHER      )
ARMSTRONG, TCCK ENTERPRISES, INC.   )
AND MARIE CARMICHAEL,               )
                                    )
          Defendants.               )
                                    )

## EMERGENCY MOTION TO CONTINUE CONTEMPT TRIAL

NOW COME the Plaintiffs, Breakthrough Coatings, Inc. and Jason LaRosa, by and through

the undersigned, and pursuant to Mass. R. Civ. P. 40(b) and Superior Court Rule 9A(d)(1), and

moves for this Honorable Court, on an emergency basis, to continue the contempt trial currently

scheduled to begin at 9:00AM on Monday, November 13, 2023, principally due to the emergency

cardiac health concern of Plaintiffs' counsel as further set forth in the undersigned's Affidavit

annexed hereto as **Exhibit A**.

As further grounds for this emergency motion, Plaintiffs state as follows:

1.    Where discovery of this matter remains ongoing, the parties have not yet taken the

deposition of non-party witness Stephen Troiano, CPA, PC, the former accountant for

Breakthrough Coatings, Inc. (the "Company"), whose testimony is critical to Jason LaRosa's

defense in this action insofar as establishing his shareholder basis in and loans to the Company, all

of which is indispensable to this Court's determination of "what" funds in the Company are

"personal," or which are "Company" funds, and whether Mr. LaRosa has violated the Order on

Preliminary Injunction issued May 13, 2022 (Paper No. 41) as alleged.

1

ç

2. In preparation for the November 13, 2023 contempt trial, the undersigned caused a trial subpoena to be served upon Mr. Troiano, whose business address is 5 Militia Drive, Lexington, Massachusetts 02421. In response thereto, Mr. Troiano's attorney, Nancy M. Reimer, Esq., advised that Mr. Troiano is suffering from and undergoing radiation therapy for cancer and that his appearance and testimony at next week's trial would be unduly burdensome. It is the expectation that Plaintiffs will be able to secure Mr. Troiano's deposition testimony in the next few months so as not to unnecessarily delay the trial of this matter.

3. Additionally, the Company's current bookkeeper, Susan Musto, of SMC Business Services, Inc., of 766 Falmouth Road, Unit B11, Mashpee, Massachusetts 02649, is a non-party witness whose testimony is also essential to this Court's determination of Ms. LaRosa's allegations of contempt and Mr. LaRosa's compliance with the injunction. As noted during the Court's November 3, 2023 conference, Ms. Musto is unavailable for trial on November 13, 2023 as she will be out of the country.

WHEREFORE, for good cause shown, Plaintiffs respectfully request that this Honorable Court enter an Order continuing the contempt trial so that undersigned counsel may attend to his health concerns and award any additional relief that is appropriate under the circumstances.

## COMPLIANCE WITH SUPERIOR COURT RULE 9A(d)(1)

On November 7, 2023, at 1:29PM, Attorney Jacobs over the telephone confirmed no opposition to this Emergency Motion from Julieta LaRosa. Attorney Aspden at 2:21PM confirmed via telephone no opposition from Marie Carmichael or TCCK Enterprises, Inc.

2

Respectfully submitted,

**BREAKTHROUGH COATINGS, INC. AND
JASON LAROSA,**

By their attorney,

Raymond H. Tomlinson, Jr., BBO# 654855
TOMLINSON | LAW
76 Tupper Road, Suite 11
Sandwich, MA  02563
Telephone:  (508) 348-9030
Facsimile:  (508) 422-0930
rht@tomlinsonlaw.com

Dated:  November 7, 2023

**NO OPPOSITION:**

**JULIETA R. LAROSA**

By her attorney,

*/s/ Travis J. Jacobs    /RHT*
Travis J. Jacobs, Esq., BBO# 671921
Amie DiGiampaolo, Esq.. BBO# 662558
THE JACOBS LAW LLC
36 Bromfield Street, Suite 502
Boston, MA 02108
Telephone:  (800) 652-4783
TJacobs@TheJacobsLaw.com
*AmieD@TheJacobsLaw.com*

**MARIE CARMICHAEL AND TCCK ENTERPRISES, INC.**

By their attorney,

*/s/ Matthew W. Aspden, II    /RHT*
Matthew W. Aspden, II, Esq.
ASPDEN LAW, P.C.
255 County Street, 2nd Floor
Somerset, MA 02726
Telephone:  (508) 567-0484
*mwa@aspdenlaw.com*

## CERTIFICATE OF SERVICE

I, Raymond H. Tomlinson, Jr., hereby certify that on this day, I forwarded notice of the foregoing document(s) via e-mail delivery, electronic delivery via the Odyssey/Tyler platform, and/or U.S. Mail Delivery thereof, postage prepaid, to the following:

Matthew W. Aspden, II, Esq.
ASPDEN LAW, P.C.
255 County Street, 2nd Floor
Somerset, MA 02726
*mwa@aspdenlaw.com*

Travis J. Jacobs, Esq.
Amie DiGiampaolo, Esq.
THE JACOBS LAW LLC
36 Bromfield Street, Suite 502
Boston, MA 02108
*AmieD@TheJacobsLaw.com*

Raymond H. Tomlinson, Jr.

Dated: November 7, 2023

4

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2172CV00436

| | |
|---|---|
| BREAKTHROUGH COATINGS, INC., AND JASON LAROSA, INDIVIDUALLY, <br><br> Plaintiffs, <br><br> v. <br><br> JULIETA R. LAROSA, CHRISTOPHER ARMSTRONG, TCCK ENTERPRISES, INC. AND MARIE CARMICHAEL, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) **· EXHIBIT A** <br> ) <br> ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF COUNSEL IN SUPPORT OF EMERGENCY MOTION TO CONTINUE CONTEMPT TRIAL AND TO CONSOLIDATE

I, Raymond H. Tomlinson, Jr., Esq., do hereby declare as follows:

1.    I am a solo practicing attorney who is counsel of record for Breakthrough Coatings, Inc., and its president, Jason LaRosa, individually, plaintiffs herein.

2.    Over the past several weeks, I have been experiencing shortness of breath which I foolishly attributed to chest congestion as one of my children brought home from school a terrible cold that has been making its way through my family.  I was diagnosed with colon cancer in 2014 and have an established medical team.  As a result of my extensive chemotherapy, I suffer a suppressed immune response and it is generally no surprise when I come down with some terrible cold after my children return to school.

3.    However, last weekend, I experienced several instances of persistent, dizzying and pounding headaches, heart palpitations, cold sweats, numbness in my left hand and sleeplessness. On Sunday, November 5, 2023, my blood pressure upon wakening was significantly elevated at 178/93 and with a resting heart rate in excess of 90bpm.  Prior to Sunday, my blood pressure has

always hovered at the high end of the "normal" range and with a resting heart rate of around 65bpm. My blood pressure remained significantly elevated throughout the weekend.

4.    First thing Monday morning, November 6, 2023, I met with my primary care physician to discuss my symptoms. I spent much of the day Monday and this morning undergoing examination, obtaining laboratory testing, and an electrocardiogram. My elevated blood pressure and shortness of breath has persisted now for four days. In light of my family history of cardiovascular disease and cardiac arrest, I have been directed to remain sedentary, significantly reduce my workload and avoid trials for the foreseeable future until I am fully examined by a cardiologist and have developed a plan for further cardiac testing and treatment, including stress tests, an ultrasound to determine damage to my heart, and if family history is any predictor, cardiac catheterization and rehabilitation.

5.    I do not make this request lightly, and fully appreciate the burden on my clients, opposing parties and their counsel, and the Court.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF NOVEMBER 2023.

Raymond H. Tomlinson, Jr.

**Commonwealth of Massachusetts**
**County of Barnstable**
**The Superior Court**

BARNSTABLE, s.s.                                    CIVIL DOCKET
                                                    No. 2172cv436


**BREAKTHROUGH COATINGS, INC., et al**

**VS.**

**JULIETTA LAROSA, INDIVIDUALLY AND DERIVATIVELY ON BEHALF
OF BREAKTHROUGH COATINGS, et al, et al**

**TRIAL ASSIGNMENT CONFERENCE ORDER**

After a Trial Assignment Conference;

It is **ORDERED**:

Atty. Tomlinson to file medical documentation
for in camera review by Dec. 13, 2023.
Scheduling Order to issue upon review.
Mar. 18, 2024 Trial date stands.


Entered: Nov. 13, 2023

_____
Thomas J. Perrino
Justice of the Superior Court

By: C. M. Hynchotham
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.                          SUPERIOR COURT DEPARTMENT
                                         CIVIL ACTION NO.: 2172CV00436

| | |
|---|---|
| BREAKTHROUGH COATINGS, INC. and, | ) |
| JASON LAROSA, INDIVIDUALLY, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JULIETA R. LAROSA, | ) |
| TCCK ENTERPRISES, INC. and | ) |
| MARIE CARMICHAEL, | ) |
|     Defendants. | ) |

## REPLY TO JASON LAROSA'S RESPONSE TO MOTION TO WITHDRAW AS COUNSEL OF RECORD FOR DEFENDANT/PLAINTIFF-IN-COUNTERCLAIM, JULIETA R. LAROSA

NOW COMES the Defendant/Plaintiff-in-Counterclaim, Julieta LaRosa ("Ms. LaRosa"),

and hereby submits this Reply to Jason LaRosa's "Reply to Motion Withdraw as Counsel."

1.      Jason LaRosa and his counsel, Raymond Tomlinson ("Attorney Tomlinson") once again

take an opportunity on a simple motion to insert their baseless and false accusations simply to get

them on the record.

2.      This Court cannot continue to ignore Attorney Tomlinson's false statements. We

respectfully request that this Court, *sua sponte*, report Attorney Tomlinson to the Massachusetts

Board of Bar Overseers for his false and perjurious testimony in this action and the Florida action

and to investigate his heart attack claims (which were used as a means to delay the Contempt Trial

which had been pending with the Court for more than one (1) year).

3.      In support of her request, Ms. LaRosa states the following:

1

a.    First, Ms. LaRosa proved through her Motion to Compel (*Docket No. 106*), that Attorney Tomlinson caused Jason LaRosa to make false statements regarding his American Express ("AMEX") credit card statements, which statements Ms. LaRosa *repeatedly tried to obtain. Jason LaRosa objected to the production of the statements* because they allegedly contained "only personal expenses unrelated to the Company." However, the Company's own financial statements belied that claim: Jason LaRosa's AMEX x1006 and AMEX x1015 accounts are referenced in no less than 1,979 transactions in the 2022 General Ledger. Further, the 2021 General Ledger showed that both AMEX cards were used for both business and personal expenses and disproved Attorney Tomlinson's claims that the AMEX 1015 account was not opened until January 2022.

b.    Second, through Ms. LaRosa's Motion to Compel (*Docket No. 106*), she also proved that Jason LaRosa produced a falsified 2022 General Ledger to falsely suggest that Julieta had taken $160,000 from Breakthrough in 2022.

c.    Third, and perhaps most shocking, through Ms. LaRosa's Motion to Compel (*Docket No. 106*), she proved that Attorney Tomlinson directed the Company's bookkeeper to increase Jason LaRosa's salary as a means to subvert this Court's Preliminary Injunction Order and also assisted Jason LaRosa in removing funds from the company which were then deposited back to the Company and designated as a "loan" from Jason LaRosa.

d.    Fourth, regarding the Florida action, at all times, Ms. LaRosa was and remains a 50% owner, Director, and officer of Breakthrough Coatings – facts which seem to be lost in the Florida filings.

2

e.     Plaintiffs intentionally failed to inform the Florida court (and Ms. LaRosa's Florida counsel) that the computer the company wanted back so badly actually belongs to Ms. LaRosa. The Apple computer was purchased using Ms. LaRosa's **personal credit card,** then the Company classified the purchase as a Company business expense. However, apparently at Mr. LaRosa's direction, the current Company bookkeeper, Susan Musto ("Ms. Musto"), later reclassified that business expense as a shareholder distribution to Ms. LaRosa. That reclassification, effectively, made the computer an expense upon which Ms. LaRosa personally paid taxes. Where such facts were omitted in the Florida matter, that court's order is based on false, inaccurate, misleading, and/or missing information.

f.     Furthermore, at the hearings in Florida, to bolster his client's claims against Julieta Larosa and allegations that she had access to some attorney-client document, **Attorney Tomlinson perjured himself** when he testified that on January 12, 2024, "Ms. LaRosa's Massachusetts counsel, Travis Jacobs, Esq. ("Attorney Jacobs"), claimed to have access to Mr. Tomlinson's legal bills, which had never been produced nor disclosed to Ms. LaRosa or any counsel." **That never happened.** Attorney Jacobs has never seen Attorney Tomlinson's legal bills – despite that, during discovery, Ms. LaRosa requested copies of those bills attributed to his representation of the Company (which invoices Plaintiffs refused to produce).

i.   In fact, on January 12, 2024, at the status conference, Attorney Tomlinson and Attorney Jacobs did not communicate except for brief small talk just prior to the hearing and in sidebar conversation with the Court. See **Exhibit A** attached hereto: *Affidavit of Matthew W. Aspden, II, Esq.* who was present at the status conference and actually sat

3

between Attorneys Jacobs and Tomlinson. Accordingly, Attorney Tomlinson's false statements under oath clearly contributed to the Florida court's findings against Ms. LaRosa. The Florida court's order is now under appeal as well.

g.    Fifth, Attorney Tomlinson now makes dangerously frivolous statements in his "Reply" that Attorney Jacobs "caused Ms. LaRosa to use Company funds to pay a legal retainer..." and that "Attorney Jacobs refused to honor the parties' agreement to return the funds by falsely claiming that no such agreement existed..." Again – these are false statements made with the sole intention to shift the Court's focus away from Attorney Tomlinson's dishonest actions.

h.    Sixth, At the January 12, 2024 hearing in this Court, Attorney Tomlinson informed Judge Perrino that he was unlikely to be cleared by his physicians for trial work for at least six (6) months – or more - due to an alleged heart attack he suffered just days before the contempt trial in this case was scheduled to begin last November.[1] Yet, remarkably, on January 16, 2024, **just four (4) days later, Attorney Tomlinson took a flight to Florida** to serve as a witness in the Florida case and gave testimony against Julieta Larosa and Christopher Armstrong.

4.    At this point, Ms. LaRosa's counsel cannot litigate a case where the Court is wholly blind to Attorney Tomlinson's falsities.

WHEREFORE, Defendant/Plaintiff-in-Counterclaim, Julieta LaRosa, respectfully requests that this Honorable Court allow counsel's Motion to Withdraw and report Attorney

---

[1] Notably, although Attorney Tomlinson has verbally represented that he suffered a heart attack on November 5, 2023, his affidavit in support of his motion to continue the contempt trial, dated November 7, 2023, never alleged he suffered an actual 'heart attack' – it claimed that he was experiencing shortness of breath and had elevated blood pressure and heart rate.

4

Tomlinson to the Massachusetts Board of Bar Overseers for his false and perjurious testimony in this action and the Florida action and to investigate his heart attack claims.

Respectfully submitted,

**Defendant/Plaintiff-in-Counterclaim,
JULIETA LAROSA, Individually and
Derivatively on Behalf of
BREAKTHROUGH COATINGS, INC.,**

By her attorneys,

*/s/ Amie D. Joseph*
Travis J. Jacobs, Esq. (BBO#: 671921)
Amie D. Joseph, Esq, (BBO#: 662558)
THE JACOBS LAW, LLC
1359 Hancock Street, Suite 10
Quincy, Massachusetts 02169
800-652-4783 (P) / 888-613-1919 (F)
TJacobs@TheJacobsLaw.com
DATED: April 11, 2024                                      AmieD@TheJacobsLaw.com

## CERTIFICATE OF SERVICE

I, Amie D. Joseph, Esq., certify that on this 11th day of April 2024 a copy of the foregoing was served upon below counsel of record via the MA Tyler Host efile system as follows:

Raymond H. Tomlinson, Jr., Esq.
TOMLINSON | LAW
1170 Main Street, Suite #1
West Barnstable, MA 02668
rht@tomlinsonlaw.com

Matthew M. Aspden, Esq.
Matthew M. Aspden, II, Esq.
ASPDEN LAW, P.C.
255 County Street, 2nd Fl.
Somerset, MA 02726
mwa@aspdenlaw.com
mma@aspdenlaw.com

*/s/ Amie D. Joseph*
Amie D. Joseph, Esq.

5

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2172CV00436

| | |
|---|---|
| BREAKTHROUGH COATINGS, INC. and,<br>JASON LAROSA, INDIVIDUALLY,<br>    Plaintiffs,<br><br>v.<br><br>JULIETA R. LAROSA,<br>TCCK ENTERPRISES, INC. and<br>MARIE CARMICHAEL,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| JULIETA R. LAROSA, Individually and<br>Derivatively on behalf of BREAKTHROUGH<br>COATINGS, INC.,<br>    Plaintiff-in-Counterclaim,<br><br>v.<br><br>JASON LAROSA,<br>    Defendant-in-Counterclaim,<br><br>And<br><br>BREAKTHROUGH COATINGS, INC.,<br>    Nominal Defendant-in-Counterclaim. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF MATTHEW W. ASPDEN, II, ESQ.

I, MATTHEW W. ASPDEN, II, hereby depose and state as follows:

1.    I am over 18 years of age and legally competent to testify. I am an attorney licensed to practice law and in good-standing in the Commonwealth of Massachusetts. I represent the co-defendants in the above-referenced civil action, TCCK Enterprises, Inc., and Marie Carmichael. I have personal knowledge of the facts stated herein.

2.    On January 12, 2024 at approximately 9:00am, a status conference was held in this case before the Hon. J. Perrino at the Barnstable Superior Court.

1

3.    I arrived early and sat in the front row of seats facing the bench in Courtroom 2. Mr. Tomlinson, counsel for the Plaintiffs, Jason Larosa and Breakthrough Coatings Inc., sat in the same row nearest to the wall to my right. While seated there, Mr. Jacobs, counsel for the Defendant, Julieta Larosa, arrived and sat in the same row of seats, directly to my left.

4.    Mr. Jacobs, Mr. Tomlinson, and I engaged in meaningless banter upon Mr. Jacobs' arrival. I made a comment to Mr. Jacobs that he was wearing a nice scarf. Mr. Tomlinson then stated 'what, you don't like my scarf?' I responded and explained that I did not realize he was wearing a scarf because it blended into the color of his suit; but that he also had a nice scarf. There was also some brief discussion about some alleged potential testimony of Mr. Jacobs' client, Julieta LaRosa, regarding my client, Marie Carmichael. Thereafter, Mr. Jacobs and I talked briefly and otherwise the three of us sat in those locations in silence until this case was called.

5.    When the case was called, the three of us stood up and Mr. Tomlinson proceeded to the table to the left, facing the bench. Mr. Jacobs and I stood and proceeded to the table to the right, facing the bench. The Court requested that the counsel for the parties come to sidebar to discuss scheduling of the trial on Julieta Larosa's contempt trial against Jason Larosa as well as the trial on the claims and counterclaims in the underlying case.

6.    At sidebar, on January 12, 2024, Mr. Tomlinson advised the court that his doctors had not yet cleared him for trial work due to his cardiac issues which commenced during or about November 2023, and that he was unsure if he could get clearance before the then-scheduled March trial in this case. The three of us remained at sidebar with Judge Perrino for several minutes discussing a multitude of issues involving the scheduling of both the contempt trial and the trial for the underlying case, as well as how Mr. Tomlinson's condition would affect the cases moving forward. After hearing counsel for the parties, Judge Perrino cancelled the trial in this case and scheduled Julieta Larosa's contempt trial for March 25, 2024, indicating that there would be no further continuances.

7.    Immediately after sidebar, we all returned to our respective tables at which we had begun the hearing.  Judge Perrino gave brief comments about the scheduling of the trial. Thereafter, Mr. Tomlinson, myself, and Mr. Jacobs gathered our belongings and Mr. Jacobs and I walked out of the courtroom together and into the parking lot. Mr. Tomlinson did not accompany us and to my knowledge was not within hearing distance of us anytime thereafter.

8.    Mr. Jacobs and I stopped in front of his truck in the parking lot and, for between five and ten minutes, we had a discussion regarding the case and other meaningless matters. When that discussion was over, I observed Mr. Jacobs get into his vehicle, I got into my vehicle, and we both drove out of the parking lot.

9.    Mr. Jacobs was in my presence from the moment he entered the courtroom and found Mr. Tomlinson and I sitting in the front row to the time when I observed Mr. Jacobs get into his vehicle to leave the parking lot following the hearing. During that time, except for discussions with the Court at sidebar and the brief meaningless 'small talk' in the

courtroom prior to the hearing, I did not observe or hear Mr. Jacobs communicate with Mr. Tomlinson at all. And during that time, I did not observe or hear Mr. Jacobs advise Mr. Tomlinson that he had received or reviewed Mr. Tomlinson's legal bills in this case.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 29th DAY OF FEBRUARY 2024.

MATTHEW W. ASPDEN, II, ESQ.

3

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.                              SUPERIOR COURT DEPARTMENT
                                             CIVIL ACTION NO.: 2172CV00436

BREAKTHROUGH COATINGS, INC. and,      )
JASON LAROSA, INDIVIDUALLY,           )
     Plaintiffs,                      )
                                      )
v.                                    )
                                      )
JULIETA R. LAROSA,                    )
CHRISTOPHER R. ARMSTRONG,             )
TCCK ENTERPRISES, INC. and            )
MARIE CARMICHAEL,                     )
     Defendants.                      )
_____ )
                                      )
JULIETA R. LAROSA, Individually and   )
Derivatively on behalf of BREAKTHROUGH )
COATINGS, INC.,                       )
     Plaintiff-in-Counterclaim,       )
                                      )
v.                                    )
                                      )
JASON LAROSA,                         )
     Defendant-in-Counterclaim,       )
                                      )
And                                   )
                                      )
BREAKTHROUGH COATINGS, INC.,          )
     Nominal Defendant-in-Counterclaim. )
_____ )

## JULIETA LAROSA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM PLAINTIFF, JASON LAROSA

Plaintiff, Jason Larosa, has failed to produce a single document in response to Defendant's

Request for the Production of Documents (the "Julieta RPDs").[1] Although Plaintiff asserts some

---

[1] Defendant's counsel apologizes to the Court for the lengthy exhibits attached to this Memorandum, but as the Court will no doubt read in this Memorandum, they are necessary to show the Court how Plaintiffs' false and misleading representations have misled this Court into

documents, such as Breakthrough's K-1 forms and Jason's Breakthrough-related workers compensation records, are "privileged", Plaintiff has failed to comply with Mass.R.Civ.P. Rule 26(b)(5) because he does not "describe the nature of the documents, communications, or tangible things not produced or disclosed…in a manner that…will enable other parties to assess the claim."

First, Plaintiff makes wholly frivolous and baseless objections to the production of documents that are clearly germane to the facts, claims, issues and defenses in this case, and to which Julieta is clearly entitled. Jason's misuse, misappropriation and embezzlement of corporate funds is material to Julieta's claims for breach of fiduciary duty and, among others, self-dealing. The records Defendant seeks are directly related to those issues and claims.

Second, Defendant demonstrates below that **Plaintiffs have repeatedly made false and misleading** statements to this Court in their filings and in oral arguments to mislead the Court and prevent Defendant's access to two American Express accounts in Jason Larosa's name. Not only are Jason's credit card statements relevant to Julieta's counterclaims (since he pays those cards with Breakthrough's funds) but where Jason used Breakthrough funds to pay the balances on those credit cards after this Court's injunction on May 12, 2022, they are material to Juliet's Complaint for Contempt.

Breakthrough's books and records alone are not sufficient here.[2] An enormous number of Breakthrough's expenses are purchased through Jason's personal credit cards. Thus, Jason can

---

denying Juliet's access to Jason's American Express statements – none of which are in Julieta's possession despite Plaintiffs' false assertion to the contrary.

[2] On October 27, 2023, Defendant served Plaintiff, Breakthrough Coatings Inc. with a current statutory books and records request. After producing documents in response to Julieta's first request over a year prior (9/12/2022), the Company's Attorney failed to produce the Company's books and records and now only offers to coordinate a time for inspection. Moreover, although the Company's new bookkeeper has produced significant financial records, key materials such as tax returns and monthly statements for the American Express accounts referenced in the General

simply assert or testify that he only used Breakthrough funds to pay for business-related "product" purchased with his credit cards, but without the credit card statements themselves to prove the transaction was actually for "product", this Court leaves Julieta without any way to rebut or verify Jason's testimony or prove he used Company funds to enrich himself, engage in self-dealing, embezzle corporate funds, breach his fiduciary duty to Julieta and violate this Court's Order.

The clearly false statements Jason has made to mislead this Court into baring Juliet's access to his American Express statements confirms how important verifying his claims will be to her Complaint for Contempt, Counterclaims and her defense.

Additionally, as discussed in Section D (and at Exhibits J through M) below, (knowingly or unknowingly) Mr. Tomlinson and Breakthrough's new bookkeeper, appear to have aided and abetted Jason's efforts to (1) extract more than $600,000 from the Company's accounts in <u>further</u> contempt of this Court's May 13, 2022 Preliminary Injunction Order and (2) conceal the true origin of, and fraudulently convert, $100,000 of Breakthrough's funds into a personal capital contribution by Jason to Breakthrough, for the purpose of allowing Breakthrough to 'repay' the funds to Jason[3].

As testified to at deposition by Breakthrough's 'new' bookkeeper, Susan Musto of SMC Business Services Inc, within days of the Court's May 13, 2022 Order, Jason instructed the bookkeeper, and Mr. Tomlinson 'confirmed' this instruction by phone with the bookkeeper, that Jason's salary should be increased from virtually zero to $300,000 per year. Ms. Musto testified she was instructed to increase Jason's weekly salary payments to more than $9,500 so that Jason would receive $300,000 for the year. However, in January 2023 when the bookkeeper lowered the payments to equal $300,000 annually (approximately $6,000 per week), Jason ordered her to return

---

Ledgers and Balance Sheets have been withheld. This is further evidence of Plaintiffs' intent to withhold documents and information from Julieta.

his weekly salary to approximately $9,500 per week. **Since the May 13, 2022 Order, Jason has extracted nearly $800,000 in contempt of the Order** [4].

Although the transcript of Day 2 of Ms. Musto's deposition testimony on December 22, 2023 is not yet available, Ms. Musto testified that Mr. Tomlinson spoke with her by phone concerning the $100,000 and informed Ms. Musto that he provided the funds to Jason, but the check was, in fact, made payable to Breakthrough Coatings Inc. See **Exhibit M**. Ms. Musto did not see the check, only the deposit transaction data imported through the Quickbooks software. She was informed that the funds were Jason's and, in consultation with Breakthrough's accountant, entered the deposit as a personal capital contribution by Jason to Breakthrough – but the funds were Breakthrough's.

I.      **ARGUMENT**

Pursuant to Rule 26 of the Massachusetts Rules of Civil Procedure, parties may obtain discovery on any non-privileged matter that is (1) relevant to any party's claim or defense; and (2) proportional to the needs of the case. Mass. R. Civ. P. 26(b)(1). Information within the scope of discovery need not be admissible in evidence to be discoverable. Id. The purpose of these discovery rules is to permit the parties "to obtain the fullest possible knowledge of the issues and facts before trial." Hickman v. Taylor, 329 U.S. 495, 501 (1947). Pursuant to Rule 37 of the Massachusetts Rules of Civil Procedure, a party may move for an order compelling discovery from an opposing party that fails to respond to a Request for Production of Documents under Rule 34 of the Massachusetts Rules of Civil Procedure, or a part fails to answer an interrogatory submitted under Rule 33.

---

[4] When added to the $190,000 that is the subject of Julieta's Complaint for Contempt, the total exceeds $790,000.

Here, Plaintiff has completely ignored and disregarded his obligation to produce discovery – and has failed to produce a single document in response to Juliet's document requests. When a party fails to comply with discovery requests, the party seeking discovery may move for an order compelling discovery and award of the moving party's reasonable expenses incurred by obtaining the order, including attorney's fees. Mass.R.Civ.P. 37(a).

## A. THE AMERICAN EXPRESS STATEMENTS

1. **In An Attempt To Prevent Defendant's Access To His American Express ("Amex") Statements For The Accounts Ending In x1006 and x1015, Jason Larosa Made The Following Statements, Which Defendant Reveals Below To Have Been *False And Misleading*:**

   a) In Response #9 and #42 to Julieta's RPDs, Jason objects and refuses to produce AMEX statements for the accounts ending in x1006 and x1015 (respectively, the "AMEX x1006" and "AMEX x1015") because the request "seeks production of documents and disclosure of information concerning **Plaintiff's personal expenses unrelated to the Company.**" (emphasis added) See **Exhibit A**.

      i. Breakthrough's financial statements detailed below and attached to this Memorandum show this claim **is blatantly false**.

   b) In his Motion to Quash Julieta's <u>first</u> and <u>second</u> subpoenas on American Express (See **Exhibit B**), <u>Jason falsely represented to the Court</u>:

      i. "[T]he subpoena seeks records 'through the present,' yet Julieta LaRosa cancelled Jason LaRosa's status as an additional cardholder in November 2021 when she left the Company and relocated to Florida.... It was not until January 2022 that Jason LaRosa first opened his own AMEX charge account (ending in 1006)." See **Exhibit B** (pars. 4 & 5); **Exhibit C** (pars. 8 & 9).

ii.     As detailed below in Breakthrough's 2022 General Ledger, Jason's AMEX
        x1006 account was <u>not cancelled</u> in November 2021 and Jason continued to
        use the card through <u>at least</u> April 25, 2022. Similarly, Jason used his
        AMEX x1015 account throughout 2022 and there is no reason to believe he
        does not continue to use it.

2.  **The following reveals the above statements by plaintiffs were false and misleading**:

    a)  Breakthrough Coatings Inc's General Ledger for 2022 (<u>See</u> **Exhibit D**) reveals that:

        i.      Jason's AMEX x1006 and AMEX x1015 accounts are referenced in no less
                than <u>1,979 transactions</u> as highlighted in pink and yellow at **Exhibit D**.

        ii.     No less than **$631,357.57** was paid <u>directly</u> to Jason's AMEX x1006
                account from Breakthrough Coatings Inc's Santander Checking Account
                ending in x1909 and an unknown account labelled "Payroll Checking", each
                as highlighted in green at pages 2 to 17 (of 101) at **Exhibit D**.

    b)  Breakthrough Coatings Inc's General Ledger for 2021 (<u>See</u> **Exhibit E**) reveals that
        Jason used his AMEX x1006 and x1015 for business and personal, and belies his
        claim that he did not open the AMEX x1015 until January 2022:

        i.      Jason's AMEX x1006 and AMEX x1015 accounts are referenced no less
                than **786 times** and <u>twenty-two (22) pages of transactions</u> made with Jason's
                AMEX x1006 and AMEX x1015 accounts appear in Breakthrough's 2021
                General Ledger as highlighted in pink and yellow at **Exhibit E**.

        ii.     No less than **$73,740.85** was charged to Jason's AMEX x1015 as shown at
                pages 111 to 130 (of 274) at **Exhibit E**.

6

iii.    No less than **$14,769.91** was charged to Jason's AMEX x1006 as shown on pages 130 to 133 (of 274) at **Exhibit E**.

c)    A photograph of the actual credit card for Jason's AMEX x1015 account shows he had been an account holder since 2021, and **further belies his claim** that he did not open the AMEX x1015 until January 2022. See **Exhibit F**.

d)    Each of the Balance Sheets of Breakthrough Coatings Inc. for the periods ending January 1, 2022, May 31, 2022 and December 31, 2022 identifies the AMEX x1006 and AMEX x1015 accounts under the Corporation's Credit Cards liabilities section. See **Exhibit G** (page 2 of each Balance Sheet). Notably, for the period ending December 31, 2022, the Balance Sheet **shows Breakthrough owes $61,735.37 in purported business expenses on Jason's AMEX x1006**. See **Exhibit G-3**.

Notably, while Jason falsely informs this Court that his AMEX x1015 account is unrelated to Breakthrough Coatings Inc., Jason subpoenaed AMEX and obtained Julieta's AMEX statements for her account ending in x1007 (which is similarly identified in Breakthrough's 2021 General Ledger) to try to demonstrate that Julieta used Company funds for *her* personal expenses. In other words, if Julieta's AMEX x1007 statements are germane to the facts and issues in this case then Jason's AMEX x1006 and x1015 – which appear right alongside Julieta's in the Balance Sheets and General Ledgers – are as well, and to assert otherwise is simply and blatantly false. Moreover, given the Complaint for Contempt that is pending against Jason, those AMEX statements are material to whether or not Jason paid for personal expenses charged on those AMEX accounts and then used Breakthrough's funds to pay off the AMEX account.

3.  **In further support of defendant's motion to compel, defendant brings to the court's attention to a key difference between breakthrough's original 2022 general ledger (which appears to have been falsified) and the new 2022 general ledger:**

a) In response to Defendant's statutory books and records demand on Breakthrough, on September 19, 2022, Breakthrough's attorney produced a General Ledger for 2022 through September 16, 2022. An excerpt of the Original 2022 General Ledger is at **Exhibit H**.

b) That Original 2022 General Ledger <u>falsely</u> identified that <u>four payments</u> totaling more than $160,000 had been made to <u>Julieta's</u> AMEX ending x1007 from May 2022 to August 2022. <u>See</u> **Exhibit H** (highlighted in pink). The line-item category is titled "American Express (1007) Julie".

c) However, what Plaintiffs could not have known at the time this document was produced was that Julieta had <u>closed</u> that credit card account ending in x1007 in <u>February 2022</u>. Thus, there is no way those payments could have been made to her AMEX account.

d) Later, on November 9, 2023, in response to Defendant's September 2023 subpoena, Breakthrough newly engaged (May 2022) bookkeeper, SMC Business Services Inc produced a General Ledger for the entirety of 2022, ending December 31, 2022 (the "New 2022 General Ledger"). However, now, under the same line-item category titled "American Express (1007) Julie" <u>all</u> the falsified payments totaling $160,000 have been deleted and replaced with a bookkeeper note by "smc25" zero'ing out the account for a closing journal entry, as highlighted in yellow at **Exhibit I** (excerpt of the New 2022 General Ledger).

e) Even more revealing is the fact that the New 2022 General Ledger reveals that each of those four payment amounts were actually paid to Jason's AMEX x1006, as highlighted in green at **Exhibit I**.

8

f) One can only reasonably conclude that the falsified Original 2022 General Ledger was designed to falsely suggest -- in evidence that would not doubt be used in this case -- that Julieta had taken $160,000 from Breakthrough in 2022.

## B. PLAINTIFF HAS FAILED TO PRODUCE A SINGLE DOCUMENT IN RESPONSE TO THESE OTHER REQUESTS.

a) <u>Request No. 2</u>. Breakthrough's IRS K-1s for years 2017 through 2022, which are in Jason's possession, custody and control.

    i. Jason speciously assets these are "privileged" records but continues to refuse to produce the K-1s for 2017 and 2018. See **Exhibit A**.

b) <u>Request No. 4</u>. All documents, reports, and/or communications you intend to present as evidence at the trial in the above-captioned civil action including, but not limited to, any documents and reports prepared by any and all experts who you intend to call to testify at trial.

    i. Jason merely objects and refuses to identify any responsive documents. See **Exhibit A**.

c) <u>Request No. 6</u>. Any and all documents and/or communications by and between you and any workers compensation or disability insurer including, but not limited to, all injury reports and workers compensation benefits claim forms.

    i. Jason speciously objects to these documents as "privileged" despite the fact that he was on workers compensation purportedly due to a work-related injury for Breakthrough. Additionally, he received those benefits during the period that Breakthrough paid Julieta a salary and Jason took her wages and transferred them into his bank account. See **Exhibit A**.

d) <u>Request No. 7</u>. Any and all documents and/or communications concerning or related to your travel to the Dominican Republic in or about February 2022.

    i. Jason speciously objects asserting these records concern personal travel despite the tickets being purchased on December 23-24, 2021 with his AMEX x1006 account as noted at pages 160-161 of **Exhibit E** (Breakthrough's 2021 General Ledger). He further falsely claims these records were "twice quashed by the Court". See **Exhibit A**.

e) <u>Request No. 8</u>. Any and all documents and/or communications concerning or related to your travel to Hawaii in late December 2021/early January 2022.

      i.    Jason speciously objects asserting these records concern personal travel. He further falsely claims these records were "twice quashed by the Court". See **Exhibit A**.

f) <u>Request No. 9</u>. Any and all of your American Express credit card records from May 1, 2022 through the present including, but not limited to, the records of Jason LaRosa and Jason LaRosa d/b/a Creative Stone including but not limited to those accounts ending in 1006 and 1015.

      i.    See above facts concerning Jason's AMEX x1006 and x1015 accounts.

g) <u>Request No. 13</u>. Any and all PayPal, Inc. account statements from January 1, 2022 to the present for Jason LaRosa including, but not limited to, the accounts with the following associated emails: caribbeanadventure41@yahoo.com; sales@coloredepoxies.com; and, jason1@creativestonesystems.com.

      i.    Jason speciously and falsely objects and asserts these records are in Julieta's possession. These records are relevant to whether Jason has diverted funds from Breakthrough to other accounts in an effort to deprive Julieta of her share of the corporation's profits. Given his efforts to prevent Julieta from obtaining and relevant documents in this case, it is entirely plausible that he has done so, and therefore these records are plainly discoverable. See **Exhibit A**.

h) <u>Request No. 14</u>. Any and all documents and/or communications related to, regarding, or concerning the 4.04 total carat weight diamond ring that was purchased in Aruba in March 2021 as set forth in paragraph 26 of your Amended Complaint.

      i.    Jason alleges that Julieta stole from him a 4.04 caret diamond. Despite that he objects and produces no documents, no receipt for purchase, no appraisal and virtually no documents that the diamond ever existed. See **Exhibit A**.

i) <u>Request No. 19</u>. Copies of any and all documents and/or communications by or between you and Marie Carmichael and/or TCCK Enterprises Inc. at any time.

      i.    Jason produces not a single communication or document in response to this request but states in his response that "after diligent search" he does not have any such documents. This is laughable since Ms. Carmichael was Breakthrough's bookkeeper for years. See **Exhibit A**.

j) <u>Request No. 20</u>. Copies of any and all communications by and/or between you and Julieta LaRosa from November 1, 2021 through the present.

      i.    In refusing to produce a single communication, Jason objects and asserts this request is harassing. Moreover, Jason asserts that Julieta has equal

access to the Company's records – which is patently false since Jason is and has been in complete control of Breakthrough since December 2021. See **Exhibit A**.

k) Request No. 21. Copies of Breakthrough Coatings, Inc.'s payroll reports and/or other reports of compensation paid to any and all of its employees and/or independent contractors from January 1, 2018 through the present.

  i.  In refusing to produce any payroll records, Jason asserts this is too burdensome and harassing.

l) Request nos. 22 to 27. Each of these requests seeks copies of any and all receipts and/or invoices for any payments made by Breakthrough Coatings, Inc. to various vendors believed to be personal expenses of Jasons.

  i.  Jason objects and does not produce a single document and asserts the documents are not reasonably calculated to lead to the discovery of admissible evidence. See **Exhibit A**.

m) Request Nos. 28 to 31, 36 to 37, 44, 46, 55-57. These requests seek copies of any and all communications by and between Jason and/or Breakthrough Coatings, Inc., on the one hand, and Anna Pinto, Jerald Pinto, Gerald Pinto, Jerry Pinto, Brian Hollis, Paige Elias, Peter Lemire, Susan Lemire, Steven Senna, James Christopher Armstrong, David Armstrong, Andrew Armstrong, Chrisopher Armstrong on the other hand, from January 1, 2022 through the present mentioning, regarding, or related to Julieta LaRosa and/or Breakthrough Coatings, Inc.

  i.  Jason objects and does not produce a single document. See **Exhibit A**.

n) Request No. 32. This request identifies specific charges made from the Breakthrough Coatings Inc account and requests copies of the corresponding receipts

  i.  Jason objects and does not produce a single document. See **Exhibit A**.

o) Requests No. 36-37. Jason refuses to produce Breakthrough's tax returns for the years 2017 to the present.

p) Request No. 39. Any and all bank statements for any account on which you are the account holder, or an authorized user, for the period January 1, 2022 through the present.

  i.  Jason objects and does not produce a single bank statement. See **Exhibit A**.

q) Request Nos. 47-50, 52. Thees requests seek copies of any and all receipts and/or invoices for any payments made by Breakthrough Coatings, Inc. to John Brazilio,

Sean McElroy, Kelly Pearsal, Matt Sherbertes, Illana Bullock from January 1, 2022 through the present.

  i.   Jason objects and does not produce a single bank statement. See **Exhibit A**.

r)   Request No. 63. All documents and/or communications which concern or relate to any investments in any interest in any business entity, association, joint venture, partnership, or other business organization in Massachusetts, from November 1, 2021 through the present.

  i.   Jason refuses to produce a single document asserting they are highly sensitive and confidential trade secrets. See **Exhibit A**.

## C. <u>**REPEATED VAGUE AND AMBIGUOUS OBJECTION SHOULD BE STRIKEN.**</u>

a.   In Plaintiff's Responses to Requests Nos. 3, 5, 10, 11, 12, 14, 15, 16, 18-32, 35, 37-41, 43- 59, 61-62, and 64-76, Plaintiff repeats the following objection:

> Subject to and notwithstanding any objection, Plaintiff states that after diligent search he does not have any non-privileged, responsive documents or things in his possession, custody, or control which have not already been produced and/or made available to the Defendant or which will be made available to Defendant at a mutually agreeable time and location, and that no documents are being withheld from said Production. Plaintiff's investigation of this matter is ongoing and thus reserves the right to supplement this Response and produce or make available for inspection and copying any additional, nonprivileged documents responsive to this Request.

This vague and non-committal objection leaves open the door for Plaintiffs to magically locate the documents just before trial and falsely assert they <u>were</u> produced. Defendant asks this Court to strike the objection and order Plaintiff to produce the documents or state unequivocally that no responsive documents were discovered after a diligent search. Moreover, to the extent Plaintiffs produce documents, the Court should order Plaintiffs to Bates stamp the documents and identify the Request(s) to which the documents respond, as required by Mass.R.Civ.P. Rule 34(b)(2)(C)(i) ("A party shall

produce documents as they are kept in the usual course of business or shall organize and label them to correspond to the categories in the request").

### D. MASSACHUSETTS LAW SUPPORTS JULIETA'S DISCOVERY DEMAND FOR INVOICES ISSUED TO BREAKTHROUGH COATINGS INC BY RAYMOND TOMLINSON JR. AND/OR TOMLINSON | LAW AND BY SHUTTS & BOWEN LLP (BREAKTHROUGH'S FLORIDA LAWYERS).

Request Nos. 33 and 80 seeks copies of invoices issued to Breakthrough Coatings Inc by Raymond Tomlinson Jr. and/or Tomlinson | Law from November 2021 through the present and from Shutts & Bowen LLP from October 2022 to the present, for the purpose of determining how much of Breakthrough Coatings Inc. funds have been used to pay for Jason's personal expenditures and to advance his personal vendetta against his ex-wife, and business partner, Julieta. These invoices are in the possession, custody and control of Jason. Although the invoices may be redacted to protect against disclosure of counsel's thoughts, mental impressions and legal strategies – to the extent those would even be in an invoice -- Plaintiff's claim of privilege is not appropriate. Moreover, where Breakthrough Coatings Inc will likely seek to recover its legal fees and costs if successful in its claims against Julieta, those invoices are relevant to its claim of damages.

Here, Breakthrough Coatings Inc.'s bookkeeper, Susan Musto, was deposed on October 16, 2023. Ms. Musto testified that as of the pay-date of May 27, 2022, Jason's salary was about $3,800 per pay period and beginning on the pay-date of June 17, 2022 it was increased to $6,700 per pay period, then to $9,825 per pay period on July 22, 2022. Notably, this occurred just days after May 13, 2022 when this Court allowed Julieta's Motion for Preliminary Injunction and enjoined Jason from using Breakthrough funds for personal expenses and attorneys fees. Ms. Musto further testified that she made the change to Jason's salary at the direction of Mr. Tomlinson. *See* **Exhibit J**, Musto Dep. 72:8 – 81:5, Ex 6 (relevant pages excerpted).

13

Moreover, on December 3, 2021, Breakthrough Coatings Inc paid into the IOLTA account of Plaintiff's attorney, Raymond Tomlinson, the sum of $287,482.00. *See* **Exhibit K**. While Julieta's Motion for Preliminary Injunction was pending, and just three (3) days before the hearing on the motion, on May 9, 2022 Jason sent a text message to Ms. Musto informing her that Jason intended to make a personal loan to Breakthrough of $100,000 so that Breakthrough could pay him back and he could then pay his personal legal fees. *See* **Exhibit L**. Jason further noted that Breakthrough had just paid $38,421.27 in legal fees on May 10, 2022. The very next day, on May 10, 2022, Mr. Tomlinson paid $100,000 to Breakthrough Coatings by check with no memo line or reference. *See* **Exhibit M**. At the deposition of Breakthrough's bookkeeper it was revealed that the $100,000 came from Mr. Tomlinson's IOLTA account, Breakthrough's accountant refused to classify the $100,000 as a "loan" and instead classified it as a capital contribution from Jason to Breakthrough. However, the apparent plan to extract money from Breakthrough by increasing Jason's salary from near zero to $300,000 a year was so successful in circumventing this Court's May 13, 2022 Order that Jason did not need to 'repay himself' the $100,000.

Here, Plaintiff has broadly and improperly invoked attorney-client and work product privileges to conceal relevant and proportional information and material – including an accounting of the funds deposited by Breakthrough into Mr. Tomlinson's IOLTA account. Plaintiff may not rely on the attorney-client privilege or the work product doctrine to withhold discoverable material and information. An order compelling disclosure is warranted and necessary.

The attorney-client privilege protects "all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice." Attorney General v. Facebook, Inc., 487 Mass. 109, 121 (2021); *see also* Mass. G. Evid. § 502(b). Massachusetts courts have consistently held that the attorney-client privilege is to be construed *narrowly.*

14

Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 304 (2009); see also Clair v. Clair, 464 Mass. 205, 215 (2013). For instance, it is axiomatic that the attorney-client privilege extends only to communications, and not to the underlying facts contained in such communications. Upjohn Co. v. United States, 449 U.S. 383, 395 (1981); see also Chambers v Gold Medal Bakery, Inc., 464 Mass. 383, 392 (2013); Facebook, 487 Mass. at 123. Moreover, Massachusetts recognizes several exceptions to the attorney-client privilege, including when the services of attorney were sought, or counsel given, in furtherance of a crime or fraud. See Mass G. Evid. § 502(d)(1). As to any communications at issue, it is the party asserting the attorney-client privilege which has the burden of establishing that the privilege applies. Clair, 464 Mass. at 215. With the foregoing in mind, the party asserting a privilege with respect to otherwise discoverable information must describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing privileged information, will enable the other party to assess the claim. Mass R. Civ. P 26(b)(5)(A). The Crime-Fraud exception to the attorney-client privilege also merits striking the Defendants' asserted privileges and disclosure of the materials and information requested.

Tripling Jason's salary and using the opacity of an IOLTA account to convert Breakthrough's funds into a personal capital contribution from Jason to Breakthrough was a clear attempt by Plaintiff to circumvent this Court's May 13, 2022 Order and have allowed Jason to continue to use company funds to subsidize Jason's legal expenses and advance this case against Julieta in 2 states.

The outrageous acts aided and abetted Jason's efforts to extract funds from the Company as salary and hide the true source of the $100,000 funds. **This is the kind of sufficiently**

**malignant purpose that this Court should – and many courts have – recognize fits squarely within the intent of the crime-fraud exception.**

    *i.   Plaintiffs Improperly Invoke the Attorney-Client Privilege to Conceal Discoverable Facts*

       A party asserting attorney-client privilege may not refuse to disclose any relevant fact within its knowledge merely because a statement of such fact was incorporated into a communication with an attorney. See Upjohn, 449 U.S. at 395-396; see also Chambers, 464 Mass. at 392 ("The privilege may not be used to immunize underlying facts available from another source from discovery merely because a client disclosed the facts to an attorney.").

       Plaintiffs assert the attorney-client privilege in such a broad and vague manner such as to encompass *both* communications and independent facts. Moreover, there is not a single instance where Plaintiffs describe the nature of *any communication* subject to the attorney-client privilege, making it impossible to distinguish between confidential communications between Plaintiffs and their clients – either Jason or Breakthrough – and facts of which Plaintiffs may have independent knowledge separate and apart from the yet-to-be-alleged confidential communication.[5] Plaintiffs therefore, fall well short of satisfying their burden of establishing that the attorney-client privilege applies, let alone whether Julieta's discovery requests implicate *any* confidential communications. See Clair, 464 Mass. at 215.

---

[5] While Plaintiffs clearly do not satisfy the Rule 26 requirement to describe the materials being withheld to attorney-client privilege with particularity, the Massachusetts Rule is more forgiving than the Federal equivalent, which if unsatisfied renders the privilege waived. Mass. R. Civ. P. 26(b)(5)(A). Massachusetts Rule of Civil Procedure 26(b)(5)(A) merely provides that the Court, upon motion, may order the withholding party to provide such additional information as is necessary to assess the claim of the privilege. Mass R. Civ. P. 26(b)(5)(A).

Despite their failure to state its claim of privilege with any particularity – as Massachusetts law requires of them – it is clear that Plaintiffs have attempted to conceal from discovery certain facts which fall outside of the scope of the attorney-client privilege and are discoverable here. Plaintiffs ostensibly are attempting to shield facts of which they have knowledge simply because it might reflect poorly on them. Plaintiffs cannot hide behind a claim of privilege under these circumstances.

ii.   *The Crime-Fraud Exception Generally*

The Crime-Fraud Exception to Attorney-Client privilege applies when the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or a fraud. Mass. G. Evid. § 502(d)(1); see also Wilson v. Sentry Insurance a Mutual Company, 222 Mass. App. Unpub. LEXIS 138*, at 8 (App. Ct. Mass. 2022); Purcell v. District Attorney for the Suffolk Dist., 424 Mass. 109, 112 (1997). The proponent of the crime-fraud exception must support its applicability by a preponderance of the evidence. Purcell, 424 Mass. at 113.

Many courts have determined that the legal term "crime-fraud exception" is "a bit of misnomer." See Rambus, Inc. v. Infineon Techs. AG, 220 F.R.D. 264, 281 (E.D.Va. 2004) (quoting Blanchard v. Edgemark Fin. Corp., 192 F.R.D. 233, 241 (N.D. Ill. 2000). Instead, other courts have concluded that the exception is not limited to allegations of an actual crime or fraud. Some have adopted broad standards, like applying the crime-fraud exception when the communication was made in furtherance of "a crime, fraud, *or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system.*" In re Sealed Case, 676 F.2d 793, 812 (D.C. Cir. 1982); see also Wachtel v. Guardian Life Ins., 2007 U.S. Dist. LEXIS 43842, at *7 (Dist. Ct. N.J. 2007) (**"[The crime-fraud exception]" can encompass**

**communications and attorney work product in furtherance of an intentional tort that undermines the adversary system itself.**"); or in furtherance of a crime or fraud, *or "where there are other abuses of the attorney-client relationship*." International Tel. & Tel. Corp. v. United Tel. Co. of Fla., 60 F.R.D. 177, 180 (M.D. Fla. 1973); or in furtherance of a crime, fraud, or "*some sufficiently malignant purpose*." In re St. Johnsbury Trucking Co. v. Bankers Trust Co., 184 B.R. 446, 456 (Bankr. D. Vt. 1995).

The result of the foregoing has been the extension of the crime-fraud exception to situations not constituting either a crime or fraud. See Rambus, 220 F.R.D. at 282 (applying crime-fraud exception where attorney's services were obtained in furtherance of spoliation of evidence); see also Parrott v. Wilson, 707 F.2d 1262, 1271 (11th Cir. 1983) (applying crime-fraud exception in situation where attorney had clandestinely recorded witness interviews); Blanchard, 192 F.R.D at 241 (holding that attorney's unauthorized negotiation and failure to obtain court approval of a settlement gives rise to crime-fraud exception).

Jason arguably used Mr. Tomlinson's services, as simultaneous and dual attorney-of-record of both Jason and Breakthrough, to cause the bookkeeper to increase Jason's salary and to fraudulently convert $100,000 of Breakthrough's funds into Jason's personal funds, all to circumvent this Court's May 13, 2022 Order. Therefore, this Court should Order the production of all of Mr. Tomlinson's invoices to Breakthrough (reasonably redacted) as well as an accounting of the $287,482.00 in funds deposited into Mr. Tomlinson's IOLTA account directly from Breakthrough's accounts including, but not limited to, the source of and an accounting of the $100,000 paid by Mr. Tomlinson to Breakthrough Coatings Inc, and which Jason claimed was a capital contribution from him, personally, to Breakthrough.

18

## I.    **CONCLUSION**

For the reasons stated above, Defendant, Julieta Larosa, respectfully requests that this Honorable Court ALLOW Defendant's Motion to Compel the Production of Documents, and issue an ORDER as follows:

(1) Compelling Jason Larosa to produce the following within ten (10) days of the date of the Order:

      a.  Monthly American Express statements for accounts in Jason Larosa's name ending in x1006 and x1015,

      b.  All invoices for payment of fees and costs issued to Breakthrough Coatings Inc by Raymond Tomlinson Jr. and/or Tomlinson | Law from November 2021 through the present,

      c.  All invoices for payment of fees and costs issued to Breakthrough Coatings Inc by Shutts & Bowen LLP from October 2022 to the present,

      d.  An accounting of the $287,482.00 paid directly from Breakthrough Coatings Inc into Mr. Tomlinson's IOLTA account and the source of the $100,000 paid by Mr. Tomlinson to Breakthrough Coatings Inc., and

      e.  Documents responsive to Request Nos. 2, 4, 6, 7, 8, 9, 13, 14, 19-27, 32, 33, 36, 37, 47-50, 52, 63 and 80.

(2) Ordering Jason to Bates stamp all documents produced in response to Julieta's document requests and to identify the Request to which the documents respond,

(3) Ordering Jason Larosa to certify in writing to this Court that he has conducted a diligent search for documents responsive to Julieta's requests, and

(4) Awarding Julieta Larosa her reasonable attorney's fees and costs related to this Motion

to Compel, upon submission of an invoice and affidavit of attorneys' fees and costs

from her attorneys.

Respectfully submitted,

**Defendant/Plaintiff-in-Counterclaim,
JULIETA LAROSA, Individually and
Derivatively on Behalf of
BREAKTHROUGH COATINGS, INC.,**
By her attorneys,

/s/ *Travis J. Jacobs*
Travis J. Jacobs, Esq. (BBO#: 671921)
Amie DiGiampaolo, Esq, (BBO#: 662558)
THE JACOBS LAW, LLC
36 Bromfield Street, Suite 502
Boston, Massachusetts 02108
800-652-4783 (P) / 888-613-1919 (F)
TJacobs@TheJacobsLaw.com
AmieD@TheJacobsLaw.com

DATED: December 22, 2023

## CERTIFICATE OF SERVICE

I, Travis J. Jacobs, Esq., certify that on this 3rd day of January 2024 a copy of the foregoing was served upon counsel of record in hand as follows:

Raymond H. Tomlinson, Jr., Esq.
TOMLINSON | LAW
1170 Main Street, Suite #1
West Barnstable, MA 02668
rht@tomlinsonlaw.com

Matthew M. Aspden, Esq.
Matthew M. Aspden, II, Esq.
ASPDEN LAW, P.C.
255 County Street, 2nd Fl.
Somerset, MA 02726
mwa@aspdenlaw.com

/s/ *Travis J. Jacobs* _____
Travis J. Jacobs, Esq.

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.                    SUPERIOR COURT DEPARTMENT
                                   CIVIL ACTION NO.: 2172CV00436


***********************************
                                     *
BREAKTHROUGH COATINGS, INC., and     *
JASON LAROSA, INDIVIDUALLY,          *
              Plaintiffs,            *
                                     *
V.                                   *
                                     *
JULIETA R. LAROSA,                   *
TCCK ENTERPRISES, INC., and          *
MARIE CARMICHAEL,                    *
              Defendants.            *
                                     *
***********************************


           REMOTE DEPOSITION of SUSAN MUSTO, a

Witness called by Counsel on behalf of

Defendant/Plaintiff-in-Counterclaim, Julieta R. LaRosa,

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, appearing

before Amy Marascio, a Certified Court Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, appearing from Norfolk County, on

Monday, October 16, 2023, commencing at 12:00 p.m.


                  Susan Baxter & Associates
                       (781) 389-5220
                   suebaxter19@yahoo.com

1  Q   Okay.  Did you ever make any inquiry of Julieta?

2  A   No.

3  Q   Okay.  Other than Jason LaRosa, did you ever make

4      any inquiry of any other party as to these

5      details related to the PayPal account or the

6      American Express account?

7          MR. TOMLINSON:  Objection.

8  Q   What was your response?

9  A   No.

10 Q   No, okay.  You stated earlier that you were

11     informed by Jason that Julieta had taken $150,000

12     from a PayPal account, right.  Is that $150,000

13     included in the 304,000 of reclassified

14     transactions?

15 A   Yes.

16         MR. TOMLINSON:  Sorry, I'm going to

17     object that that mischaracterizes Ms. Musto's

18     testimony.  Her testimony was that Julieta had

19     stolen $150,000.  She did not testify that it

20     came from PayPal.

21 Q   Okay.  Is it your contention that those funds

22     came from PayPal, Ms. Musto?

23 A   I would have to check that.

24 Q   Okay.  Well --

```
                                                    Page 72
 1              MR. JACOBS:  2022.

 2              THE WITNESS:  '22.

 3              MR. JACOBS:  2022.

 4              MR. TOMLINSON:  Oh, sorry, and I'm

 5         sorry, Susan, what was your response?

 6              THE WITNESS:  The shareholder

 7         distribution for '22 for Jason was $14,015.83.

 8    Q    And you also handled inputting the payroll for

 9         Breakthrough in 2022, correct, or at least from

10         April/May forward?

11    A    Yes.

12    Q    Okay.  And did Jason LaRosa's salary change in

13         2022 after you started doing the payroll for the

14         company?

15    A    Yes.

16    Q    And how did it change?

17    A    He wasn't getting paid prior to that.

18    Q    And what did he start getting paid when you came

19         on in April or May of 2022?

20    A    I'm not sure when he first got paid.  I'd have to

21         look that up, but he was given a salary of

22         300,000.

23    Q    Okay.  Do you know if Mr. LaRosa is still on

24         workers' comp?
```

Page 73

```
 1                    MR. TOMLINSON:  Objection.
 2      A    I didn't know he was on workers' comp.
 3      Q    I'm going to share my screen again, all right.
 4           Do you recognize this document?
 5      A    Yes.
 6      Q    Can you tell me what it is?
 7      A    It's a payroll report from May to September.
 8      Q    All right.  Just bear with me here, okay.  At the
 9           bottom of page 1, the first page in this document
10           --
11                    MR. JACOBS:  Which we will mark as
12           Exhibit Number 6, Amy.
13                    (Whereupon, Payroll Details Report was
14                    marked as Exhibit Number 6.)
15      Q    Do you see the row for Jason LaRosa?  Do you see
16           that?
17      A    Yes.
18      Q    Okay.  And it seems to say the pay period from
19           September 4th to September 10th with a pay date
20           of September 16, 2022, was for a gross amount of
21           $9,825; is that correct?
22      A    Yes.
23      Q    All right.  Do you recall what Mr. LaRosa's --
24           I'm sorry, strike that.  Was Mr. LaRosa's gross
```

Page 74

```
 1          weekly pay the same amount when you started in

 2          April or May of 2022?

 3     A    No.

 4     Q    What was his gross weekly pay when you started in

 5          April/May of 2022?

 6     A    I don't believe he was getting paid anything.

 7     Q    Okay.  Let me switch from my Exhibit 6 --

 8     A    I would have to look to see when he first got

 9          paid.

10     Q    -- back to --

11               MR. TOMLINSON:  I'm sorry, there was

12          some crosstalk there.  Susan, what did you say?

13               THE WITNESS:  I said I would have to

14            see when he first got paid.  I don't recall.

15     Q    All right.  I'm going to switch back to the

16          profit and loss detail statement for 2022.

17               MR. JACOBS:  I forget what we marked

18          this, Amy.  Do you remember?

19               COURT REPORTER:  Yeah, it's Exhibit 3.

20               MR. JACOBS:  Exhibit 3, thank you.

21               COURT REPORTER:  Yes.

22     Q    Okay.  Here we go.  All right, Ms. Musto, can you

23          see the screen?

24     A    Yes.
```

1   Q   All right, so what I wanted to ask you about if

2       you look here, you can see that under this

3       category "Wages" --

4   A   Uh-huh.

5   Q   Do you see that column "Wages," okay, and if you

6       look at the dates for, where is it, May 27, 2022,

7       you see it says, "Jason LaRosa, Gross Pay, This

8       is not a legal paystub," et cetera, et cetera?

9   A   Mm-hm.

10  Q   And you see the amount associated with Jason

11      LaRosa on May 27th is $3,846.15?

12  A   I can't see that.  The pictures -- everybody's

13      pictures are --

14  Q   Sorry.

15  A   Yeah, I do see that, yes.

16  Q   Okay.  Now if you just look up a little bit to

17      May 13, 2022, you see that it says, "Jason D.

18      LaRosa, Gross Pay," and then that week was just

19      $100.  Do you see that?

20  A   I think that's his son.

21  Q   Jason D. LaRosa is his son?

22  A   I think so, yes.  Jason LaRosa is the dad.

23  Q   Okay.  All right, so going then from May 27,

24      2022, with a pay of $3,846.15, just about a month

1    later, you see June 24, 2022, Jason LaRosa, and

2    the gross pay is 6,700. Do you see that?

3    A    Yes.

4    Q    Okay. Does this refresh your recollection at all

5         about what Mr. LaRosa's pay, Jason LaRosa's pay,

6         was when you started for Breakthrough in April or

7         May of 2022?

8    A    Yes, it refreshes it. Like I said, I don't

9         remember what the first time he got paid for that

10        year was.

11   Q    Okay. All right, and then scrolling down, you'll

12        see then January 29th and August 5th of 2022,

13        Jason LaRosa's gross pay is now $9,825. Do you

14        see that?

15   A    Yes.

16   Q    All right. Okay, so it would appear that, at

17        least, from May 27th to -- between May 27th and

18        July 22nd, according to this profit and loss

19        statement, Mr. LaRosa's wages increased from

20        about $3,800 to $9,800; is that correct?

21   A    Yes.

22   Q    Okay. Do you know why Mr. LaRosa's salary

23        increased in that manner?

24   A    Yes, I was asked to pay him 300,000 a year so --

1    Q    Okay.

2    A   -- We tried to calculate what the balance of the

3    year was and adjusted his pay accordingly.

4    Q   Okay, and who asked you to do that?

5             MR. TOMLINSON:  Objection.

6    A    Attorney Tomlinson.

7    Q    Attorney Tomlinson asked you to increase Jason

8    LaRosa's wages?

9    A   We discussed -- he discussed that it should -- we

10   should bump him up to 300,000.

11   Q   And did he explain why?

12   A   I did not ask why.

13   Q   Did he explain why?

14   A   I didn't ask why.

15   Q   Did he tell you or give you a reason for this

16   increase?

17           MR. TOMLINSON:  Objection.

18   A   No, we didn't discuss why.

19   Q   You didn't find it unusual that Mr. Tomlinson

20   would call you up and ask you to increase Jason's

21   wages to 300,000 a year?

22           MR. TOMLINSON:  Objection.

23   A   I assumed that there was a good reason for it.

24   Q   Okay.  Did Mr. Tomlinson give you any other

Page 78

1    instructions or suggestions or directions with

2    regard to the financials or financial information

3    of Breakthrough Coatings?

4    A    No.

5    Q    You don't want to take a minute to consider your

6        memory?

7                 MR. TOMLINSON:    Objection.

8    A    I can't think of anything else he told me, no.

9    Q    Was this the first time that Mr. Tomlinson had

10       contacted you about modifying something in the

11       Breakthrough Coatings' financials?

12                MR. TOMLINSON:    Objection, that was not

13       her testimony.

14   A    It was the only time we discussed anything.

15   Q    Did you confirm this change with Jason?

16   A    I don't recall.

17   Q    How did you know that Mr. Tomlinson was

18       authorized to suggest this kind of a change?

19                MR. TOMLINSON:    Objection.

20   A    I don't --

21   Q    You can answer.

22   A    -- recall.  I don't recall.

23   Q    Okay.  What was Jason's compensation prior to Mr.

24       Tomlinson's request?

1                    MR. TOMLINSON:  Objection.

2    A    As I said, in the beginning of the year, I don't

3         think he got paid at all.

4    Q    Okay.  When did Mr. Tomlinson contact you about

5         making this change?

6    A    I don't --

7                    MR. TOMLINSON:  Objection.

8    A    -- recall.

9                    MR. TOMLINSON:  Sorry, Susan, please

10        afford me an opportunity to object before you

11        answer, thank you.

12                   THE WITNESS:  Okay.

13   Q    Was it by phone or another method of

14        communication?

15   A    I believe it was by phone.

16   Q    When was Mr. LaRosa's compensation changed to

17        300,000 a year?

18                   MR. TOMLINSON:  Objection.

19   A    I would imagine it coincides with his pay going

20        up.

21   Q    Right.  That's what I'm asking, so when did you

22        make that change?

23   A    You'd have to look at that profit and loss.

24   Q    Well, according to the profit and loss statement,

Page 80

1           Mr. LaRosa's compensation changed from $3,846.15

2           to $6,700 on June 17, 2022, and then increased

3           from there to $9,825 on July 22, 2022?

4    A      To make up for the -- I think I probably

5           calculated the 67 to be the 300,000 and then

6           realized we had months that we needed to make up

7           for, so it went up again.

8    Q      Okay.  So that would suggest that sometime

9           between June 10, 2022, and June 17, 2022, is when

10          Mr. Tomlinson contacted you and instructed you to

11          change Jason's salary to 300,000 a year; is that

12          right?

13                      MR. TOMLINSON:  Objection.

14   Q      Is that correct, Ms. Musto?

15   A      I don't recall the date.

16   Q      Right.  But that's when you made the change,

17          correct?

18   A      That's when I made the change, correct.

19   Q      Okay.  And you said you made the change at the

20          direction of Mr. Tomlinson, correct?

21                      MR. TOMLINSON:  Objection, objection.

22   Q      Is that correct, Ms. Musto?

23   A      Yes.

24   Q      At that time, at the time that Mr. Tomlinson

1        contacted you with this instruction, were you

2        aware of the ongoing civil litigation involving

3        Julieta LaRosa?

4                MR. TOMLINSON:  Objection.

5   A   I don't recall.

6   Q   Did you ever have any discussions with Mr.

7        Tomlinson about the reclassification of

8        transactions from business expenses to

9        shareholder distributions to Julieta?

10              MR. TOMLINSON:  Objection.

11   A   I don't recall.

12   Q   So it's possible that you did have discussions

13        with Mr. Tomlinson about reclassifying those

14        transactions from business expenses to

15        shareholder distributions to Julieta?

16              MR. TOMLINSON:  Objection.

17   A   Shareholder distributions were not just to

18        Julieta.

19   Q   No, I understand that, but, Ms. Musto, I'm not

20        asking you whether they were just to her or not,

21        okay, and I'm asking you whether you ever

22        discussed that process -- that reclassification

23        process with Mr. Tomlinson?

24   A   I don't recall.

1   Q   Do you know whether or not she accessed the

2        company's QuickBooks from Florida?

3   A   I have no idea.  I don't know.

4   Q   Okay.  Have you seen the PayPal transactions

5        where she used PayPal to transfer money from the

6        company's PayPal account to her personal email

7        address?

8   A   I would have to look at the PayPal detail for

9        that.

10   Q   But assuming that to be true, did you include

11        those transactions in her shareholder

12        distribution?

13   A   If it was coded to her, then, yes, it went to her

14        shareholder.

15   Q   So is it safe to say that if she took $155,000

16        from the company's PayPal account and you booked

17        a shareholder distribution to her of $305,000,

18        then that means there's still $150,000 worth of

19        personal purchases that Julieta LaRosa made with

20        company money?

21   A   Yes.

22               MR. JACOBS:  Objection.

23   Q   But you still booked over $84,000 of personal

24        expenses to Jason LaRosa in 2021?

Page 159

1     was that he was going to give me a true answer.

2   Q   And you believed that even though you were aware

3       that Jason and Julieta are involved in this

4       litigation?

5           MR. TOMLINSON:   Objection.

6   A   Yes.

7   Q   Is that correct?

8   A   Yes.

9   Q   Okay.  You made a statement, and I just want to

10      make sure I understand, when you were testifying

11      in response to Mr. Tomlinson's questions about

12      the increase of salary to 300,000.  You appeared

13      to suggest that the salary was increased so that

14      he could pay personal expenses that were

15      previously run through the company.  Is that

16      accurate characterization of what you testified

17      to?

18  A   Yes.

19  Q   And did you discuss that objective or purpose

20      with Mr. Tomlinson?

21  A   No.

22          MR. TOMLINSON:   Objection.

23  A   No.

24  Q   Okay.  So Mr. Tomlinson didn't suggest that Mr.

1       LaRosa's salary be increased so that he could pay

2       those personal expenses out of his personal

3       account?

4              MR. TOMLINSON:  Objection.

5   A   I believe what was discussed was that he should

6       be making what the job called for.  I mean, he

7       wasn't getting a salary at all before that.

8   Q   Okay.  Now you testified that his salary started

9       at $3,825 and then you had increased it to $6,700

10      and then you increased it again to $9,825, and

11      you testified that the reason for that was

12      because you were trying to make it so that he

13      would receive a salary of 300,000.

14   A   Correct.

15   Q   Okay.  Were you trying to increase Mr. LaRosa's

16      salary to 300,000 going forward from that point,

17      or was your intent to ensure that Mr. LaRosa

18      received 300,000 in 2022?

19            MR. TOMLINSON:  Objection.

20   A   Yes, that he would receive it in 2022, a total of

21      300,000.

22   Q   Okay.  Because when you do the math out on $9,825

23      per pay period, it comes out to obviously a whole

24      lot more annualized.

Page 161

1    A    But it didn't start until June, so I had figured

2         out how many weeks were left in the year and

3         bumped him up to what would get to the 300,000 at

4         the end of the year.

5    Q    Correct, and so effectively what you did was you

6         gave Mr. LaRosa, you effectively gave Mr. LaRosa,

7         a salary of $600,000 a year for the remainder of

8         2022, from June to December, right?

9                   MR. TOMLINSON:  Objection.

10   A    No.

11                  MR. TOMLINSON:  Objection.

12   Q    Well, at $9,825 per pay period that comes out to

13        about $600,000?

14   A    At the end of the year, his W-2 showed a little

15        over 300,000.

16   Q    Well, I understand --

17   A    For the year.

18   Q    -- for the year, that's right, for the year, but

19        from June to December 31st, he received $300,000

20        in that six-month period, correct?

21                  MR. TOMLINSON:  Objection.  Travis,

22        you're arguing.  She's asked and answered.

23        You're arguing with her.  You don't like her

24        response.

```
 1              MR. JACOBS:  I'm not arguing with her,
 2      Ray.
 3   Q  Ms. Musto, that's correct, right, that he
 4      received $300,000 for that period from June 2022
 5      to December of 2022, correct?
 6   A  He received a little over $300,000 for the year.
 7   Q  Okay, but he received it in payments that began
 8      in June of 2022 when you bumped his salary up
 9      through the end of the year?
10   A  Yes.
11   Q  Okay.  Now annualized, that weekly salary was
12      closer to $600,000 a year annualized, correct?
13              MR. TOMLINSON:  Objection, objection.
14      That's not her testimony.  Her testimony was that
15      annualized it was $300,000.
16              MR. JACOBS:  You're not listening to
17      the question, Ray.
18              MR. TOMLINSON:  Oh, Travis, I'm --
19              MR. JACOBS:  Stop testifying.
20              MR. TOMLINSON:  -- listening very
21      carefully.
22              MR. JACOBS:  Stop testifying.
23              MR. TOMLINSON:  I'm listening very
24      carefully.  I'm going to object to the form of
```

Page 193

1      for the company because she wasn't on the

2      company's payroll, that expenses that are booked

3      to her American Express and then automatically

4      populating the company's QuickBooks pursuant to a

5      rule that was not created by you but was in pre-

6      existence, that you would look at that and try

7      and push that expense into her personal

8      shareholder distribution?

9   A   If I felt it was personal, then, yes, I would do

10     that.

11  Q   And her attorneys never contacted you to say this

12     expense or that expense belongs to the family or

13     belongs to Jason LaRosa or is a business expense?

14  A   No.

15  Q   You mentioned that Jason LaRosa told you that the

16     jet skis should be booked equally between the two

17     of them.  Did he tell you why?

18  A   No.

19  Q   Have you ever reviewed any company documents that

20     shows that Julieta LaRosa was on the purchase and

21     sale agreement for one or more of the jet skis?

22  A   No.

23  Q   You're aware that the company's Tesla was

24     purchased by the company though, correct?

Page 21

1  Q.  And this appears to be a text communication
2      between you and Mr. LaRosa; is that correct?
3  A.  Is it me and Mr. LaRosa?  Can you scroll up?
4      Yes.
5  Q.  So this line of text that we're looking at
6      currently, it appears the date is July 15, 2022;
7      is that correct?
8  A.  Yes.
9  Q.  And is this the text message that you were just
10     referring to?
11 A.  Yes.
12 Q.  Can you read that for me?
13 A.  Talking to the attorney, we should be somewhere
14     between 250 and 300,000, so I'm thinking 50,000
15     -- what I need to do -- thinking 50,000.  What do
16     you think?  I need to do a 401(k).  I need Gary
17     need guide me.  I need to spend money, trucks,
18     buildings, new wives, LOL.
19 Q.  And you received this text message from Jason
20     LaRosa?
21 A.  Yes.
22 Q.  And after you received this text message what did
23     you do?
24 A.  I confirmed with Mr. Tomlinson that I was to bump

Page 22

1      him up.
2  Q.  And what do you mean by "bump him up"?
3  A.  Increase his salary.
4  Q.  And what was his salary increased to at that
5      time?
6  A.  300,000.
7          MR. JACOBS:  Amy, if we could mark this
8      file of text messages as Exhibit Number 41,
9      please.
10         MR. TOMLINSON:  How many pages is that,
11     Travis?  It says 98 on the corner.  I just
12     want to make sure that the entire text chain
13     is marked as an exhibit.
14         MR. JACOBS:  Yeah, we're going to mark
15     the whole thing, and it looks to be 98
16     pages, yeah.
17         (Whereupon, text messages (98 pages)
18     were marked as Exhibit Number 41.)
19 Q.  Going back to Exhibit 22, the payroll summary,
20     the text messages you received were dated July
21     15, and it appears from the payroll summary that
22     on July 22, 2022, Jason LaRosa's salary was
23     increased to $9,825 weekly; is that correct?
24 A.  Yes.

Page 23

1  Q.  You said you confirmed with Mr. Tomlinson.  What
2      did you confirm with him?
3          MR. TOMLINSON:  Objection.  You can
4      answer.
5  A.  How much to pay him, to pay Jason, a year.
6  Q.  Now, Mr. Tomlinson doesn't own Breakthrough
7      Coatings, Incorporated, right?
8  A.  Right.
9  Q.  To your knowledge, he's not an officer or a
10     director of the company, is he?
11 A.  No.
12 Q.  Why did you need to confirm the increase of
13     Jason's salary after Jason had already asked you
14     to do so?
15 A.  I didn't need to confirm it.  I just was speaking
16     with him.  Jason said that he'd spoken to Ray and
17     I wanted -- it came up, and I confirmed it with
18     him.
19 Q.  Okay, and what did you talk about?  Was this on a
20     phone call?
21 A.  Yes.
22 Q.  And what did you and Mr. Tomlinson discuss on
23     that call?
24 A.  I don't recall.  Other than the salary, I don't

Page 24

1      recall what else we talked about.
2  Q.  Okay.  Now if we scroll though Exhibit 22, the
3      payroll summary, we see that Mr. LaRosa continues
4      to be paid $9,825 through the remainder of 2022,
5      correct?
6  A.  Can you go to the end of the year, please?
7  Q.  Okay.
8  A.  Yes.
9  Q.  So the pay date of 12/30/2022 Mr. LaRosa received
10     $9,825 for his weekly salary, correct?
11 A.  Yes.
12 Q.  Now, on December 9, 2022, Mr. LaRosa was paid a
13     weekly salary of $34,825.  Do you see that?
14 A.  Yes.
15         MR. TOMLINSON:  Objection.
16 Q.  Can you tell me why Mr. LaRosa's salary was
17     increased from $9,825 a week to $34,825 for this
18     week ending December 9, 2022?
19 A.  Yes, we were trying to get him to the 300,000.
20 Q.  When you say "we," who is "we"?
21 A.  My office.
22 Q.  And why were you trying to get him to the
23     300,000?
24 A.  Because that's the salary we agreed on.

Page 25

```
 1   Q.   Okay, so it sounds like the objective was to
 2        ensure that Jason received at least $300,000 in
 3        salary for the entire year of 2022.
 4               MR. TOMLINSON:  Objection.
 5   Q.   Is that accurate?
 6   A.   Yes.
 7   Q.   And because Mr. LaRosa didn't take a salary prior
 8        to May 13, 2022, in order for him to receive the
 9        full 300,000, you had to make up the difference;
10        is that accurate?
11   A.   Yes.
12               MR. TOMLINSON:  Objection.
13   Q.   At any point in time did you ask or attempt to
14        contact Julieta LaRosa to confirm that Jason
15        LaRosa's salary was acceptable to her?
16               MR. TOMLINSON:  Objection.
17   A.   No.
18   Q.   At the time that you increased Jason LaRosa's
19        salary in May of 2022, were you aware that a
20        court order had been issued enjoining Jason
21        LaRosa from doing certain things with regard to
22        Breakthrough Coatings?
23               MR. TOMLINSON:  Objection.
24   A.   I'm not sure what the date was that I learned
```

Page 26

```
 1        that.
 2   Q.   Okay, but you did learn at some point that the
 3        Court had issued an order enjoining Jason from
 4        doing certain things with regards to Breakthrough
 5        Coatings, right?
 6   A.   Yes.
 7   Q.   In fact, Mr. Tomlinson emailed you a copy of that
 8        order, didn't he?
 9   A.   Yes.
10               MR. TOMLINSON:  Can you rotate the
11        screen, Travis?
12               MR. JACOBS:  Hang on one second.  I'm
13        trying to flip it.
14   Q.   Okay, Ms. Musto, so I'm showing you an email
15        dated May 18, 2022.  Do you see that?
16   A.   Yes.
17   Q.   And you received this email from -- it looks like
18        he received it from Jason@coloredepoxies.com,
19        correct?
20   A.   Yes.
21   Q.   And based on the substance of the email, he
22        pasted an email from Mr. Tomlinson; is that
23        correct?
24   A.   That's what it looks like.
```

Page 27

```
 1   Q.   And so it would appear that as of May 18, 2022,
 2        you were aware that the Court had entered this
 3        order enjoining Mr. LaRosa, correct?
 4   A.   Yes.
 5               MR. JACOBS:  Amy, can we mark this as
 6        Exhibit Number 43, please.
 7               (Whereupon, 5/18/22 email was marked as
 8        Exhibit Number 43.)
 9   Q.   Now, at any point in time after you received this
10        email, did you ask Jason or Mr. Tomlinson whether
11        the payroll increases that you were processing
12        violated this court order?
13               MR. TOMLINSON:  Objection.
14   A.   No.
15   Q.   Did you ask anyone else or discuss with anyone
16        else the possibility that that salary increase
17        may violate this court order?
18   A.   No.
19   Q.   All right, showing you a document on the screen
20        that was produced in response to the subpoena at
21        Exhibit 1C.  Can you tell me what this document
22        is?
23   A.   It's a 941 quarterly payroll return.
24   Q.   And for what year?
```

Page 28

```
 1   A.   2022.
 2   Q.   And from this document are able to tell what
 3        quarter this 941 form is for?
 4   A.   If you go to the top.  It's for the first
 5        quarter.
 6   Q.   Okay, and so can you tell me what this form is
 7        for?
 8   A.   It reports to the Internal Revenue the income and
 9        the taxes that were deducted and need to be paid
10        to the government.
11   Q.   Okay.  Am I correct in stating that this form
12        reflects the taxes due to the government for the
13        first three months of the calendar year?
14   A.   Yes.
15   Q.   And based on this form, which appears to be for
16        January, February and March 2022, are you able to
17        identify how much wages were paid out to
18        employees by Breakthrough Coatings?
19   A.   Yes.
20   Q.   And what was that amount?
21   A.   Zero.
22               MR. JACOBS:  Amy, can we mark this as
23        Exhibit Number 11.
24               (Whereupon, 2022 941 Quarterly Payroll
```

Page 57

```
1    Q.   Ms. Musto, what is GSI, US?
2    A.   I believe it's an insurance company.  I'd have to
3         look it up.  I'm not sure.
4    Q.   On this invoice at Exhibit 21, it's addressed to
5         Jason LaRosa or Accounts Payable Colored Epoxies.
6         Do you see that?
7    A.   Yes.
8    Q.   What is Colored Epoxies?
9    A.   I don't know.
10   Q.   Have you ever heard of that name before today?
11   A.   I've heard it before, yes, but I'm not exactly
12        sure what it is.
13   Q.   And Breakthrough Coatings paid this invoice to
14        GSI, US, correct?
15   A.   Yes.
16   Q.   And that payment is represented by this payment
17        confirmation at page 1 of Exhibit 21, correct?
18   A.   Yes.
19             MR. TOMLINSON:  Travis, I need three
20        minutes when you have a moment.
21             MR. JACOBS:  Oh, this is probably a
22        good time to take a break then, right,
23        because my screen is being difficult.  Do
24        you want to take a five-minute break?
```

Page 58

```
1              MR. TOMLINSON:  Yeah, that would be
2         great.  Thank you.
3              MR. JACOBS:  Yeah, all right.
4              (Whereupon, a brief recess was then
5         taken.)
6              MR. JACOBS:  We are back on the record,
7         and just let the record reflect that we took
8         a quick five-minute break.
9    BY MR. JACOBS:
10   Q.   And, Ms. Musto, you understand that you remain
11        under oath, correct?
12   A.   Yes.
13   Q.   Just before the break, we were taking a look at
14        what's been marked as Exhibit 23.  Can you tell
15        me what this document is?
16   A.   It's a profit and loss statement for '22.
17   Q.   For Breakthrough Coatings, Incorporated?
18   A.   Yes.
19   Q.   And this document shows a total revenue income
20        was $2,061,524, correct?
21   A.   Yes.
22   Q.   It shows total legal expenses of $29,075.50; is
23        that correct?
24   A.   Yes.
```

Page 59

```
1    Q.   And then it shows officer wages $313,338 --
2         sorry, $313,338.45; is that correct?
3    A.   Yes.
4    Q.   And in 2022 Jason was the officer who was paid
5         those wages; is that correct?
6    A.   Yes.
7    Q.   And it shows that the total wages for the entire
8         company was 374,000 approximately, correct?
9    A.   Yes.
10   Q.   And then for 2022, the company reported a loss of
11        net income in the amount of approximately 58,000;
12        is that right?
13   A.   Yes.
14             MR. JACOBS:  Amy, can we mark this as
15        Exhibit 23, please.
16             (Whereupon, 2022 Profit and Loss
17             Statement was marked as Exhibit Number
18             23.)
19   Q.   So I'm showing you a one-page sheet of text
20        messages.  Do you see this?
21   A.   Yes.
22   Q.   Are these text messages that you produced in
23        response to our subpoena?
24   A.   Yes.
```

Page 60

```
1    Q.   And based on the date of these text messages,
2         they appear to be from May 9, 2022; is that
3         right?
4    A.   Yes.
5    Q.   And who are the people communicating in these
6         messages?
7    A.   It's Jason communicating with me.
8    Q.   And can you read this message that's on the
9         screen now and goes on to the next page?  Can you
10        read that for me?
11   A.   "Susan, I need to do a loan to the company to be
12        paid back later on.  This is $100,000 deposit
13        into the business personal loan which I will have
14        to pay myself back later to help cover legal
15        expenses.  38,421.27 was pulled out by bank check
16        today to pay the attorney."
17   Q.   Now, Jason is saying in the text that $38,421.27
18        was pulled out of the account to pay the
19        attorney.  Do you know whether those funds came
20        out of Breakthrough Coatings' account?
21   A.   I don't recall.
22   Q.   Okay.  Would you have that information somewhere?
23   A.   It would be in the general ledger.
24   Q.   Okay.  Well, going back to Exhibit 23, we see
```

Page 61

1  that for 2022, this is an entire year, the
2  company reported that it only paid 29,000
3  approximately in legal expenses, right?
4  A.  Yes.
5  Q.  But in the text message at what has been
6  premarked as Exhibit 24 also in 2022, Jason is
7  telling you that just over 13,000 was pulled out
8  by check that day?
9  A.  I don't recall.  I'd have to look to see.  I
10  don't even know which attorney it was or if it
11  came out of the company.  I don't know.
12  Q.  Okay.  Now, he also refers to a $100,000 deposit
13  into the business for a personal loan, which he
14  would pay himself back later to cover legal
15  expenses, right?
16  A.  Yes.
17  Q.  Did he ever make that deposit, that personal
18  loan, to the business?
19  A.  Yes, and it was picked up as a capital
20  contribution, not a personal loan.
21  Q.  Okay, why was it classified as a capital
22  contribution?
23  A.  I talked to Peter Lemire about it, and it's not
24  considered a loan if there's not regular payments

Page 62

1  or interest.
2  Q.  And who made the capital contribution?
3  A.  Jason said he deposited the money into the bank.
4  Q.  All right, and do you recall approximately when
5  he made this capital contribution?
6  A.  I don't recall, no.
7  Q.  Was it around May 9, May 11, 2022?
8  A.  I would imagine, yes.
9  Q.  And do you know what the effect of classifying
10  this payment as a capital contribution was?
11       MR. TOMLINSON:  Objection.
12  A.  It was coded to his shareholder distribution
13  account.
14  Q.  And so would his shareholder distribution account
15  show an additional positive $100,000 as a result
16  of that contribution?
17       MR. TOMLINSON:  Objection.
18  A.  It would be a net of whatever else was in that
19  account at the time.
20  Q.  Okay, and then, now, does he receive any
21  payments, you know, refunds of that capital
22  contribution?
23  A.  No.
24  Q.  Sorry, strike that.  Has he received any payments

Page 63

1  or returned any part of his capital contribution
2  since he deposited the $100,000?
3  A.  No.
4       MR. JACOBS:  Amy, can we mark this two-
5  page document of text messages as Exhibit
6  Number 24, please.
7       (Whereupon, text messages (2 pages) was
8  marked as Exhibit Number 24.)
9  Q.  Showing you a check drawn from Cape Cod 5 Bank,
10  the remitter is identified as Raymond Tomlinson,
11  and it's a payment to the order of Breakthrough
12  Coatings, Incorporated.  Do you see that?
13  A.  I see it.
14  Q.  And what's the dollar amount of that check?
15  A.  $100,000.
16  Q.  What's the date of the check?
17  A.  May 10, 2022.
18  Q.  And do you know if Jason made any other kind of
19  capital contribution or deposit of $100,000 in
20  2022?
21  A.  No.
22  Q.  Is it your understanding that this check is a
23  100,000 capital contribution that he made in or
24  about May 2022?

Page 64

1  A.  I do not know that.
2  Q.  But you do have access to the books and you
3  haven't seen any other deposit of $100,000 into
4  Breakthrough's account from Jason, have you?
5  A.  No.
6  Q.  You said that it was a capital contribution by
7  Jason.  How do you know that?
8       MR. TOMLINSON:  Objection.
9  A.  The text message from Jason is what I had that
10  said that he was putting $100,000 into the bank.
11  Q.  Okay, and you didn't see him deposit those funds,
12  did you?
13  A.  No.
14  Q.  You didn't see the check that he used to deposit
15  those funds?
16  A.  No.
17  Q.  Do you have access to his personal bank accounts?
18  A.  No.
19  Q.  He never provided you or -- strike that.  Did he
20  provide you with a deposit receipt for the
21  $100,000?
22  A.  No.
23       MR. JACOBS:  Amy, can we mark this as
24  Exhibit Number 26, please.

Page 65

1    (Whereupon, copy of 5/10/22 check was
2        marked as Exhibit Number 26.)
3    Q.   At some point Jason informed you that Julieta had
4         taken money from Breakthrough Coatings; is that
5         right?
6    A.   Yes.
7    Q.   And his position was that she stole the money,
8         right?
9    A.   I don't know what his position was.
10   Q.   He never said that Julieta stole money from the
11        company?
12   A.   I don't know that he ever used the word "stole."
13   Q.   What word did he use?
14   A.   I don't recall, took.  I don't know.
15   Q.   And did Jason ever tell you that he moved money
16        from Breakthrough's bank accounts to his
17        attorney's IOLTA account?
18             MR. TOMLINSON:  Objection.
19   A.   No.
20   Q.   When you were going through the books for 2021,
21        did you ever see a large debit in the amount of
22        $287,482?
23   A.   What account is this?
24   Q.   First I'm just asking if you ever saw when you

Page 66

1         reviewed the 2021 books?
2    A.   No.
3    Q.   So on the screen right now, do you know what that
4         is?
5    A.   It's a checking withdrawal, money market
6         withdrawal.
7    Q.   And the signature on the checking withdrawal, do
8         you recognize that signature?
9    A.   Not really, no.
10   Q.   Now, you're familiar with Jason's signature,
11        right?
12   A.   Yes, I am, but it doesn't really look like
13        Jason's signature.
14   Q.   This checking withdrawal slip is for $287,482; is
15        that correct?
16   A.   Yes.
17   Q.   And the back of that slip has the name Raymond H.
18        Tomlinson, Jr.; is that correct?
19   A.   Yes.
20   Q.   Does Breakthrough have a Cape Cod 5 account?
21   A.   No.  No.
22   Q.   Now, on the screen here, which is page 1 of
23        what's been premarked as Exhibit 25, you can see
24        several transactions, but a handful of them say

Page 67

1         "Payroll Breakthrough COA."  Is that right?
2    A.   Right.
3    Q.   And to your knowledge, you've never seen that
4         Breakthrough Coatings has a bank account at Cape
5         Cod 5 Savings; is that right?
6    A.   They had one that started in -- there was an
7         account that was brand new at the very end of
8         '21, I believe.  I believe that's a Cape Cod 5.
9    Q.   Okay, and is that a Breakthrough Coatings
10        account?
11   A.   It was set up to be a payroll account, as I was
12        told by the banker, that money was moved into
13        temporarily and then moved back into the company,
14        but it was a brand new account.  It was not an
15        existing account.
16   Q.   Okay, and when you say that money was moved into
17        it and then back out of it, what do you mean?
18   A.   There was money transferred from the operating
19        account into this account, this Cape Cod 5
20        account, and then it was transferred back into
21        the company's payroll account.
22   Q.   And the operating account you're referring to, is
23        that the Santander account ending in 1909?
24   A.   Yes.

Page 68

1    Q.   And the dollar amount that I believe you're
2         referring to is 170,000; is that right?
3    A.   Yes.
4    Q.   Now other than that temporary --
5    A.   Can I just say something?  I'm sorry.
6    Q.   Sure.
7    A.   I'm not sure if that temporary account was Cape
8         Cod 5 or Santander to be honest with you.  I
9         can't remember which bank it was.
10   Q.   Going back, did Jason ever tell you or have you
11        seen any documents or transaction receipts to
12        show that Jason moved $287,000 of Breakthrough
13        funds to his attorney's IOLTA account?
14             MR. TOMLINSON:  Objection.
15   A.   No.
16   Q.   I'm sorry, can you repeat that?
17   A.   No.
18             MR. JACOBS:  Amy, can you mark this as
19        Exhibit 25.
20             (Whereupon, Checking/Money Market
21        Withdrawal Receipt was marked as
22        Exhibit Number 25.)
23   Q.   And other than Jason telling you that he made the
24        capital contribution of $100,000 in May of 2022,

Page 69

1  you have no information or evidence that that
2  $100,000 came from Jason's personal funds; is
3  that right?
4  A.  I'm sorry, can you repeat that?
5  Q.  Other than Jason telling you that he made a
6      capital contribution of $100,000 or -- strike
7      that.  Other than Jason telling you that he
8      deposited $100,000 into Breakthrough's bank
9      account, you have no documentation or evidence
10     that indicates that that $100,000 was his
11     personal money?
12 A.  Actually, I got a phone call from Ray Tomlinson
13     after we did the last deposition, and he told me
14     that he had loaned Jason the $100,000.
15 Q.  That his attorney loaned him the $100,000 --
16          MR. TOMLINSON:  Objection.
17 Q.  -- to make the capital contribution to
18     Breakthrough?
19 A.  Yes.
20          MR. TOMLINSON:  To clarify the record
21          --
22          MR. JACOBS:  No, you're not testifying
23     today, Ray.
24          MR. TOMLINSON:  You testified earlier.

Page 70

1  I have my IOLTA check right in front of me,
2  Travis.
3          MR. JACOBS:  Absolutely, yeah, yeah.
4          MR. TOMLINSON:  Okay.  You know under
5      the rules I'm not allowed to make a loan, so
6      why would I make a loan?
7          MR. JACOBS:  Why would you tell Ms.
8      Musto that you made a loan, Ray?
9          MR. TOMLINSON:  I didn't tell her that.
10     That was her interpretation.  I didn't tell
11     her, Travis, but while you're testifying and
12     asking questions --
13         MR. JACOBS:  All right, Ray, Ray -- off
14     the record, please.
15         (Whereupon, a brief recess was then
16         taken.)
17         MR. JACOBS:  Okay, we took a quick
18     break, and Ray wants to explain on the
19     record about this $100,000.
20         MR. TOMLINSON:  I received money into
21     my firm's IOLTA account that was represented
22     to me to be Jason LaRosa's personal funds.
23     From that, I issued at his request a check
24     of $100,000.  It was a bank check that at

Page 71

1  his direction I issued to Breakthrough
2  Coatings and gave him that bank check.  I
3  believe that bank check was deposited at
4  Santander, but the -- I'll finish, Travis.
5  You're not questioning me.  I'm making a
6  statement.  The treasurer's check that I
7  received from -- the remitter on that is
8  from Jason LaRosa in the amount of 287,482.
9  It is dated 12/3/21 at Banking Center 0110,
10 and I deposited that into my IOLTA account.
11         MR. JACOBS:  And then represented to
12     the --
13         MR. TOMLINSON:  Travis --
14         MR. JACOBS:  -- Court that those funds
15     were --
16         MR. TOMLINSON:  -- I am making a
17     statement.  I am making --
18         MR. JACOBS:  -- were Breakthrough's
19     funds.
20         MR. TOMLINSON:  -- a statement.  I'm
21     not going to answer your questions.
22         MR. JACOBS:  That's what you did.  You
23     represented to the Court that those funds
24     were Breakthrough funds in your filings and

Page 72

1  in your oral arguments to demonstrate that
2  your client had pulled funds out of
3  Breakthrough to protect them from being
4  stolen from Julieta.  Then what you claimed
5  you --
6          MR. TOMLINSON:  No, that is not --
7          MR. JACOBS:  -- did is you converted
8      those funds --
9          MR. TOMLINSON:  -- what I said.
10         MR. JACOBS:  -- into personal funds of
11     Jason's and concealed the true origin of
12     them, but, Ray, we're going to get to that.
13         MR. TOMLINSON:  I'm sure we will,
14     Travis.  And we can also talk about the
15     funds that you received into your account
16     from Ms. LaRosa, but you're --
17         MR. JACOBS:  Yeah, we can do that.
18         MR. TOMLINSON:  -- right, we'll talk
19     about all that later.
20         MR. JACOBS:  I didn't --
21         MR. TOMLINSON:  I'm looking forward to
22     that.
23         MR. JACOBS:  -- do any laundering.  No
24     laundering over here.

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

I, Amy Marascio, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That **SUSAN MUSTO** personally appeared and proved to me through satisfactory evidence to be the Witness whose testimony is hereinbefore set forth. She was duly sworn by me; her testimony thereupon given was recorded by me and transcribed by me, and such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I hereunto set my hand and notarial seal this 27th day of October 2023.

_Amy Marascio_
Amy Marascio, Court Reporter
Notary Public
My Commission Expires
May 31, 2030

# EXHIBIT C

1    IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT

     IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA

2                   CIRCUIT CIVIL DIVISION

3

4    BREAKTHROUGH COATINGS,

     INC.,

·5                            CASE NO.: 22-CA-009745

       Plaintiff,

6                          DIVISION:   I

     vs.

7

     CHRISTOPHER R. ARMSTRONG,

8    and JULIETA R. LAROSA,

9      Defendants.

     _____/

10

11

12

13       HEARING BEFORE THE HONORABLE PAUL L. HUEY

                   Pages 103 to 261

14                    Volume 2

15

16              January 30, 2024

17           3:59 p.m. to 7:32 p.m.

18      𝒪        800 East Twiggs Street

19              Tampa, FL   33602

20

21

22

23          Stenographically Reported By:

24    HEATHER M. ANDREWS, Certified Court Reporter,

25               Notary Public

Page 104

1    APPEARANCES:
2       ALIETTE D. RODZ, ESQUIRE
        ALEKSEY SHTIVELMAN, ESQUIRE
3       Shutts & Bowen LLP
        200 S Biscayne Blvd Ste 4100
4       Miami, FL 33131-2362
        Office: 305-358-6300
5       Cell: 305-358-6300
        Arodz@shutts.com
6
7       Raymond H. Tomlinson, Jr., Esq.
        Pro Hac Vice
8       TOMLINSON | LAW
        76 Tupper Road, Suite #11
9       Sandwich, MA 02563
        Telephone:  (508) 348-9030
10      Www.tomlinsonlaw.com
11
                On behalf of the Plaintiff
12
13
        TANESHA BLYE, ESQUIRE
14      The Law Office of T. Walls Blye, PLLC
        66 W Flagler St Ste 900
15      Miami, FL 33130
        Office: 786-796-1814
16      Cell: 305-801-2756
        Twallsblyelaw@gmail.com
17
                On behalf of the Defendants
18
19
20
21
22
23
24
25

Page 190

1  being taken place to satisfy the Massachusetts -- or

2  taking place as a form of satisfaction of the

3  Massachusetts matter; correct?

4      A.   Your statements are on the record as are mine.

5      Q.   Is that correct, sir?

6      A.   Your statements are on the record as are mine.

7      Q.   I'm asking you if it's correct, sir.  I'm not

8  asking you if my statements are on the record.

9      A.   Your statement was that you are not admitted in

10 Massachusetts and that you did not represent

11 Mr. Armstrong.

12     Q.   And because you continued to insist that the

13 deposition take place in satisfaction of the

14 Massachusetts matter, I kept making an objection and

15 expressing my concern regarding that because I wasn't a

16 Massachusetts barred attorney and I am not today;

17 correct?

18          MS. RODZ:  Objection, Your Honor,

19     argumentative.

20          THE COURT:  Overruled.

21          You can answer.

22     A.   The Massachusetts Court had ordered that

23 Mr. Armstrong sit for a four-hour deposition.  That is a

24 standing order of the Massachusetts Court.

25     Q.   (By Ms. Blye)  Am I barred in Massachusetts,

1   sir?

2       A.   You are not.

3       Q.   Have I appeared at any of those proceedings?

4           THE COURT:  Okay, ma'am, we know you're not

5       barred in Massachusetts, right.  And 99% of all law

6       in America is the same, right.  So I'm not sure

7       where this is going, right.  Because there's

8       Motions in Limine later, right, so I get that.  But

9       it's argument to me.  You don't need to keep asking

10      him the same question.  I'm the one that heard the

11      hearings, the motions.  It's against Florida law

12      that you don't stop depositions.  It's pretty clear

13      Florida law.

14      Q.   (By Ms. Blye)  So the discussion that was had

15  between you and I at the beginning of Mr. Armstrong's

16  deposition was solely related to my concern regarding

17  your insistence that it take place related to the

18  Massachusetts matter?

19          MS. RODZ:  Objection, Your Honor, asked and

20      answered.  We can move on.

21          THE COURT:  It's sustained.  We got the

22      record.  He's answered.

23      Q.   (By Ms. Blye)  At the time Mr. Armstrong left

24  the deposition were you still insisting that it take

25  place in satisfaction of the Massachusetts matter?

Page 192

1    A.    I take issue with your characterization.

2          THE COURT:   I don't now what that -- I don't

3    know what the word "satisfaction" means.   I've

4    heard it so many times.   Honestly, I don't know

5    what it means.   I'm really understanding of the

6    rules, and I don't know what the word

7    "satisfaction" means.

8          MS. BLYE:   What I'm trying to elicit from the

9    witness, Your Honor, is that he was trying to

10   conduct the deposition.

11         THE COURT:   So they could be used in the

12   Massachusetts case?

13         MS. BLYE:   Yes.

14         THE COURT:   So we all went to law school and

15   we learned on rules and procedure, whether they're

16   federal or state, that any statement of a witness

17   can be used against them at any time, right.   We

18   don't necessarily have to label it.   You ask a

19   question and they answer.   And whether that applies

20   to a case in Massachusetts or Hawaii or Alaska we

21   really don't care.   I don't know why we would care

22   but it's not satisfaction.   It's that they could be

23   used in accordance with the Massachusetts Rules of

24   Civil Procedure and Evidence in the proceeding up

25   there; correct?

1        A.    Correct, Your Honor.

2        Q.    (By Ms. Blye)  At the time of Mr. Armstrong's

3   deposition, sir, that was after our discussion where I

4   expressed that I did not agree with your proposal for

5   the depositions to be used in both the Florida and

6   Massachusetts cases?

7        A.    I didn't propose that the depositions be used

8   in either or one of the jurisdictions.  They were

9   properly noticed in both jurisdictions.  You sought an

10  emergency motion to limit the testimony in Florida.

11  That was denied.  I was proceeding under the Court's

12  order that in Massachusetts that Mr. Armstrong be able

13  to sit for four hours of a deposition and Your Honor's

14  order denying the motion to limit that.  So it was

15  proper for me to proceed with the depositions under both

16  notices.  There was no opposition, no protective order,

17  nothing to quash.  There was nothing filed in

18  Massachusetts that would stop that deposition.

19       Q.    Let's be clear.  There was no order from the

20  Court prior to Mr. Armstrong's deposition?

21            THE COURT:  Which court?

22            MS. BLYE:  From this Court.

23       Q.    (By Ms. Blye)  There was no order from the

24  Florida Court saying that the deposition must proceed

25  prior to Mr. Armstrong's deposition; correct?

SUPERIOR COURT
BARNSTABLE, SS

OCT 03 2022

FILED
~~~~~~~~~~~~~ Clerk

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2172CV00436

| | |
|---|---|
| BREAKTHROUGH COATINGS, INC. and JASON LAROSA, INDIVIDUALLY, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| JULIETA R. LAROSA, CHRISTOPHER R. ARMSTRONG, TCCK ENTERPRISES, INC., and MARIE CARMICHAEL, | ) ) ) ) |
| Defendants | ) ) ) |
| v. | ) ) |
| JOHN DOES 1-5 AND JANE DOES 1-5, | ) ) ) |
| Reach-and-Apply Defendants, | ) ) ) |
| v. | ) ) |
| CAPE COD FIVE CENTS SAVINGS BANK, BANK OF AMERICA, N.A., and JPMORGAN CHASE BANK, N.A., | ) ) ) ) |
| Trustee Process Defendants. | ) ) |

ALLOWED

10-6-22

## DEFENDANT CHRISTOPHER ARMSTRONG'S EMERGENCY MOTION FOR PROTECTIVE ORDER, PURSUANT TO MASS. R. CIV. P. 26(c)

**48**

Pursuant to Mass. R. Civ. P. 26(c), Defendant Christopher R. Armstrong hereby moves that

the Court endorse the *Proposed Protective Order* attached hereto as an Order of the Court binding on

Plaintiffs Jason LaRosa and Breakthrough Coatings, Inc. (together hereinafter, "Plaintiffs"), relieving

him of the obligation to respond to discovery requests served upon him by Plaintiffs, because such

discovery requests vastly exceed the scope of discovery authorized by this Court. This Motion is

1

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2172CV00436

| | |
|---|---|
| BREAKTHROUGH COATINGS, INC. and JASON LAROSA, INDIVIDUALLY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| JULIETA R. LAROSA, CHRISTOPHER R. ARMSTRONG, TCCK ENTERPRISES, INC., and MARIE CARMICHAEL, | ) ) ) ) |
| Defendants | ) ) |
| v. | ) ) |
| JOHN DOES 1-5 AND JANE DOES 1-5, | ) ) |
| Reach-and-Apply Defendants, | ) ) ) |
| v. | ) ) |
| CAPE COD FIVE CENTS SAVINGS BANK, BANK OF AMERICA, N.A., and JPMORGAN CHASE BANK, N.A., | ) ) ) ) |
| Trustee Process Defendants. | ) ) |



## [PROPOSED] PROTECTIVE ORDER

Pursuant to Mass. R. Civ. P. 26(c), this Court hereby enters the following Protective Order

concerning discovery requests served by plaintiffs Breakthrough Coatings, Inc. and Jason LaRosa

("Plaintiffs") on defendant Christopher Armstrong ("Mr. Armstrong") on September 7, 2022:

(a) **July 19, 2022 Orders**. On July 19, 2022, this Court allowed Plaintiffs' *Cross-Motion*

*for Jurisdictional Discovery* and stated, "In allowing this motion the court makes no judgment on

provided in the Massachusetts Rules of Civil Procedure to answer such requests, beginning with the date of service of such new requests, and no objections by Mr. Armstrong to such requests shall be deemed waived due to the fact this Protective Order relieves Mr. Armstrong of the requirement to answer them after the September 7, 2022 service of such requests.

(e) **Period During Which Protective Order Remains in Effect.** Unless otherwise agreed or ordered, this Protective Order shall remain in force until such time as this Court has ruled on whether it has jurisdiction over Mr. Armstrong in response to a renewed Motion to Dismiss by Mr. Armstrong.

(f) **Other Defendants.** This Order shall not affect the scope or conduct of discovery between Plaintiffs and the remaining defendants.

So Ordered this _6_ day of _OCTOBER_, 2022.

_____ ,J.
Justice of the Massachusetts Superior Court

# EXHIBIT D

the specific jurisdictional discovery that the plaintiff proposes. The plaintiff will need to serve the deposition notice along with any request for documents. The defendant may challenge any requests for documents. The deposition of Mr. Armstrong is limited to four hours and shall take place by Zoom." On the same date, this Court denied Mr. Armstrong's *Motion to Dismiss* without prejudice pending the outcome of the limited jurisdictional discovery permitted pursuant to this Court's allowance of Plaintiffs' *Cross-Motion for Jurisdictional Discovery*. The Court's Orders related to cross-motions concerning the same disputed issue and must be read together.

(b) **Scope of Discovery.** Pursuant to this Court's Orders issued July 19, 2022, Plaintiffs shall be permitted to seek discovery from Mr. Armstrong for the sole purpose of seeking evidence that a Massachusetts court may exercise jurisdiction over Mr. Armstrong. Plaintiffs may not serve discovery in support of a "conspiracy theory" of personal jurisdiction; in other words, Plaintiffs may not seek discovery at this time concerning actions undertaken by other parties.

(c) **Form of Discovery.** Plaintiffs shall be permitted to seek such jurisdictional discovery only by way of document requests and a deposition of Mr. Armstrong (conducted entirely via Zoom) that shall last no more than four hours.

(d) **Prior Discovery Requests.** Mr. Armstrong shall not be required to respond to the document requests, interrogatories and/or requests for admission served on Mr. Armstrong by Plaintiffs on September 7, 2022. If Plaintiffs seek production of documents on Mr. Armstrong on the issue of jurisdiction, they must do so by serving a new set of document requests on Mr. Armstrong, which requests shall seek to elicit only information related to the issue of jurisdiction. To the extent that Plaintiffs serve discovery requests on issues other than jurisdiction at a later point in this litigation, when authorized to do so by this Court, and such requests are duplicative of any request served on September 7, 2022, Mr. Armstrong shall have the full period of time

1    Q    Do you know whether or not she accessed the

2         company's QuickBooks from Florida?

3    A    I have no idea.  I don't know.

4    Q    Okay.  Have you seen the PayPal transactions

5         where she used PayPal to transfer money from the

6         company's PayPal account to her personal email

7         address?

8    A    I would have to look at the PayPal detail for

9         that.

10   Q    But assuming that to be true, did you include

11        those transactions in her shareholder

12        distribution?

13   A    If it was coded to her, then, yes, it went to her

14        shareholder.

15   Q    So is it safe to say that if she took $155,000

16        from the company's PayPal account and you booked

17        a shareholder distribution to her of $305,000,

18        then that means there's still $150,000 worth of

19        personal purchases that Julieta LaRosa made with

20        company money?

21   A    Yes.

22             MR. JACOBS:  Objection.

23   Q    But you still booked over $84,000 of personal

24        expenses to Jason LaRosa in 2021?

**Heritage Accounting & Tax Services**
**335 Cotuit Rd Unit 4**
**Sandwich, MA 02563-5109**
**508-888-0086**

September 16, 2022

**CONFIDENTIAL**

Julieta Larosa
3 Manor Lane
East Falmouth, MA 02536

Dear Shareholder:

We have prepared the enclosed copy of Form 1120-S, Schedule K-1 for Breakthrough Coatings, Inc.. It contains your share of the corporation's items of income (loss), credits and deductions, and other information for the corporation's tax year ended December 31, 2021. These items are to be reported on your federal income tax return; therefore, this Schedule should be retained with your tax records and documentation.

Also enclosed is state K-1 information, if applicable. This information should also be retained with your tax records and documentation.

Also enclosed is shareholder basis information. This information consists of your stock and loan basis in the corporation and, if applicable, your share of any suspended or disallowed losses. Retain this information with your tax records; it may be needed to complete your federal income tax return.

If you have any questions, or if we can be of assistance in any way, please do not hesitate to call.

Sincerely,


Heritage Accounting & Tax Services

Page 48

1  Q   Okay.  Did you ever make any inquiry of Julieta?

2  A   No.

3  Q   Okay.  Other than Jason LaRosa, did you ever make

4      any inquiry of any other party as to these

5      details related to the PayPal account or the

6      American Express account?

7              MR. TOMLINSON:  Objection.

8  Q   What was your response?

9  A   No.

10 Q   No, okay.  You stated earlier that you were

11     informed by Jason that Julieta had taken $150,000

12     from a PayPal account, right.  Is that $150,000

13     included in the 304,000 of reclassified

14     transactions?

15 A   Yes.

16             MR. TOMLINSON:  Sorry, I'm going to

17     object that that mischaracterizes Ms. Musto's

18     testimony.  Her testimony was that Julieta had

19     stolen $150,000.  She did not testify that it

20     came from PayPal.

21 Q   Okay.  Is it your contention that those funds

22     came from PayPal, Ms. Musto?

23 A   I would have to check that.

24 Q   Okay.  Well --

671121

| | |
|---|---|
| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

| **Schedule K-1** **(Form 1120-S)** | **2021** |
|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2021, or tax year |

beginning _____ ending _____

## Shareholder's Share of Income, Deductions, Credits, etc.

▶ See separate Instructions.

### Part I   Information About the Corporation

**A** Corporation's employer identification number
**82-1526487**

**B** Corporation's name, address, city, state, and ZIP code
**BREAKTHROUGH COATINGS, INC.**

**3 MANOR LANE**
**EAST FALMOUTH    MA   02536**

**C** IRS Center where corporation filed return
**E-FILE**

**D** Corporation's total number of shares

| | |
|---|---|
| Beginning of tax year | **1,000** |
| End of tax year | **1,000** |

### Part II   Information About the Shareholder

**E** Shareholder's identifying number
**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**

**F** Shareholder's name, address, city, state, and ZIP code
**JULIETA LAROSA**
**3 MANOR LANE**

**EAST FALMOUTH    MA   02536**

**G** Current year allocation percentage ............. **50.000000 %**

**H** Shareholder's number of shares

| | |
|---|---|
| Beginning of tax year | **500** |
| End of tax year | **500** |

**I** Loans from shareholder

| | |
|---|---|
| Beginning of tax year | $ **0** |
| End of tax year | $ **0** |

For IRS Use Only

---

### Part III   Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| **1** | Ordinary business income (loss) **231,051** | **13** | Credits |
| **2** | Net rental real estate income (loss) | | |
| **3** | Other net rental income (loss) | | |
| **4** | Interest income | | |
| **5a** | Ordinary dividends | | |
| **5b** | Qualified dividends | **14** | Schedule K-3 is attached if checked ............... ▶ ☐ |
| **6** | Royalties | **15** | Alternative minimum tax (AMT) items |
| **7** | Net short-term capital gain (loss) | | |
| **8a** | Net long-term capital gain (loss) | | |
| **8b** | Collectibles (28%) gain (loss) | | |
| **8c** | Unrecaptured section 1250 gain | | |
| **9** | Net section 1231 gain (loss) | **16 D** | Items affecting shareholder basis **336,134** |
| **10** | Other income (loss) | | |
| | | **17 V\*** | Other information **STMT** |
| **11** | Section 179 deduction | **AD\*** | **STMT** |
| **12 A** | Other deductions **1,465** | | |
| **18** | ☐ More than one activity for at-risk purposes\* | | |
| **19** | ☐ More than one activity for passive activity purposes\* | | |
| | \* See attached statement for additional information. | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.    www.irs.gov/Form1120S    **Schedule K-1 (Form 1120-S) 2021**
DAA

# Schedule K-1 (1120-S) List of Codes

**10. Other income (loss)**

A   Other portfolio income (loss)
B   Involuntary conversions
C   Section 1256 contracts & straddles
D   Mining exploration costs recapture
E   Section 951A(a) income inclusions
F   Inclusions of subpart F income
G   Section 951(a)(1)(B) inclusions
H   Other income (loss)

**12. Other deductions**

A   Cash contributions (60%)
B   Cash contributions (30%)
C   Noncash contributions (50%)
D   Noncash contributions (30%)
E   Capital gain property to a 50% organization (30%)
F   Capital gain property (20%)
G   Contributions (100%)
H   Investment interest expense
I   Deductions – royalty income
J   Section 59(e)(2) expenditures
K   Reserved for future use
L   Deductions – portfolio (other)
M   Preproductive period expenses
N   Reserved for future use
O   Reforestation expense deduction
P   through R Reserved for future use
S   Other deductions

**13. Credits**

A   and B Reserved for future use
C   Low-income housing cr (sec 42(j)(5)) from post-2007 bldgs
D   Low-income housing cr (other) from post-2007 bldgs
E   Qualified rehabilitation expenditures (rental real estate)
F   Other rental real estate credits
G   Other rental credits
H   Undistributed capital gains credit
I   Biofuel producer credit
J   Work opportunity credit
K   Disabled access credit
L   Empowerment zone employment credit
M   Credit for increasing research activities
N   Credit for employer social security and Medicare taxes
O   Backup withholding
P   Other credits

**15. Alternative minimum tax (AMT) items**

A   Post-1986 depreciation adjustment
B   Adjusted gain or loss
C   Depletion (other than oil & gas)
D   Oil, gas, & geothermal – gross income
E   Oil, gas, & geothermal – deductions
F   Other AMT items

**16. Items affecting shareholder basis**

A   Tax-exempt interest income
B   Other tax-exempt income
C   Nondeductible expenses
D   Distributions
E   Repayment of loans from shareholders
F   Foreign taxes paid or accrued

**17. Other information**

A   Investment income
B   Investment expenses
C   Qualified rehabilitation expenditures (other than RRE)
D   Basis of energy property
E   Recap of low-income housing cr (sec 42(j)(5))
F   Recap of low-income housing cr (other)
G   Recapture of investment credit
H   Recapture of other credits
I   Look-back interest – completed long-term contracts
J   Look-back interest – income forecast method
K   Dispositions of property with section 179 deductions
L   Recapture of section 179 deduction
M   Section 453(l)(3) information
N   Section 453A(c) information
O   Section 1260(b) information
P   Interest allocable to production expenditures
Q   Capital construction fund (CCF) nonqualified withdrawals
R   Depletion information - oil and gas
S   andT Reserved for future use
U   Net investment income
V   Section 199A information
W   through Z Reserved for future use
AA  Excess taxable income
AB  Excess business interest income
AC  Gross receipts for section 448(c)
AD  Other information

12869  Breakthrough Coatings, Inc.
82-1526487
FYE: 12/31/2021

# Federal Statements

### Julieta Larosa
### 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

## Schedule K-1, Box 17, Code AD - Other Information

| Description | Shareholder Amount |
|---|---|
| GAIN ON EXCESS DISTRIBUTION | 33,291 |

| Form **1120-S**<br>Schedule K-1 | **Schedule K-1, Box 17, Code V**<br>**Shareholder's Section 199A Information** | **2021** |
|---|---|---|
| | For calendar year 2021 or tax year beginning                    , ending | |

| Name<br>**BREAKTHROUGH COATINGS, INC.**<br>**JULIETA LAROSA** | Taxpayer Identification Number<br>**82-1526487**<br>**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** |
|---|---|

| | Activity Description | Pass-Through<br>Entity EIN | PTP | Aggregated | SSTB |
|---|---|---|---|---|---|
| Column A | **PAGE 1 ACTIVITY** | | ☐ | ☐ | ☐ |
| Column B | | | ☐ | ☐ | ☐ |
| Column C | | | ☐ | ☐ | ☐ |
| Column D | | | ☐ | ☐ | ☐ |
| Column E | | | ☐ | ☐ | ☐ |

| QBI or Qualified PTP items: | Column A | Column B | Column C | Column D | Column E |
|---|---|---|---|---|---|
| Ordinary business income (loss) | 231,051 | | | | |
| Net rental real estate income (loss) | | | | | |
| Other net rental income (loss) | | | | | |
| Royalty income (loss) | | | | | |
| Section 1231 gain (loss) | | | | | |
| Other income (loss) | | | | | |
| Section 179 deduction | | | | | |
| Other deductions | | | | | |
| **W-2 wages** | 56,842 | | | | |
| **Qualified property** | 108,265 | | | | |

**Other Information:**
QBI allocable to cooperative pmts received
W-2 wages allocable to qualified payments
Section 199A(g) deduction

**Section 199A REIT dividends**

## Shareholder's Basis Worksheet Page 1

| Form **1120-S** | | |
|---|---|---|
| **Schedule K-1** | For calendar year 2021 or tax year beginning _____, ending _____ | **2021** |

| Name | BREAKTHROUGH COATINGS, INC. | Taxpayer Identification Number | 82-1526487 |
|---|---|---|---|
| | JULIETA LAROSA | | 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 |

### Stock Basis

| | | | |
|---|---|---|---|
| 1. | Beginning of year stock basis | | 71,792 |
| 2. | Capital contributions | | |
| | **Additions:** | | |
| 3. | Ordinary business income | 231,051 | |
| 4. | Net rental income | | |
| 5. | Interest, dividends, royalties and net capital gains | | |
| 6. | Net Section 1231 gain | | |
| 7. | Tax-exempt interest and other income | | |
| 8. | Other income | | |
| 9. | Gain on disposal of Section 179 assets | | |
| | Total of line 3 through line 9 | | 231,051 |
| 10. | Other increases | | |
| 11. | Subtotal (Add line 1 through line 10) | | 302,843 |
| | **Subtractions:** | | |
| 12. | Distributions          TOTAL DISTRIBUTIONS          336,134 | | 302,843 |
| 13. | Total losses and deductions applied against stock basis (See Shareholder's Basis Worksheet Page 2) | | |
| 14. | Other decreases | | |
| 15. | Amount used to restore loan basis | | |
| 16. | End of year stock basis (Subtract the sum of lines 12 through 15 from line 11) | | 0 |

### Loan Basis

| | | | |
|---|---|---|---|
| 17. | Beginning of year loan basis | | |
| 18. | Loans to corporation | | |
| 19. | Loan basis restored - amount used in prior years to offset losses | | |
| 20. | Other increases | | |
| 21. | Loan repayments | | |
| 22. | Total losses and deductions applied against loan basis (See Shareholder's Basis Worksheet Page 2) | | |
| 23. | Other decreases | | |
| 24. | End of year loan basis (Subtract the sum of lines 21 through 23 from the sum of lines 17 through 20) | | 0 |
| 25. | End of year stock and loan basis (Add line 16 and line 24) | | 0 |
| | Principal amount of loan owed to shareholder at end of the year | | 0 |

### Gain Recognized on Excess Distributions

| | | | |
|---|---|---|---|
| 26. | Distributions | | 336,134 |
| 27. | Stock basis before distributions and loss items | | 302,843 |
| 28. | Gain recognized on excess distributions (Subtract line 27 from line 26) | | 33,291 |

### Gain Recognized on Repayment of Shareholder Loan

| | | | |
|---|---|---|---|
| 29. | Loan basis at beginning of tax year | | |
| 30. | Loan basis restored - amount used in prior years to offset losses | | |
| 31. | Loan basis before loan repayment (Add line 29 and line 30) | | |
| 32. | Shareholder loan at beginning of tax year | | |
| 33. | Loan repayments to shareholder during tax year | | |
| 34. | Nontaxable return of loan basis ((Line 31 divided by line 32) multiplied by line 33) | | |
| 35. | Gain recognized on repayment of shareholder loan (Subtract line 34 from line 33) | | |

**Note to shareholder:** This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.

| Form **1120-S** Schedule **K-1** | | **Shareholder's Basis Worksheet Page 2** | | | | | | | | | **2021** |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | For calendar year 2021 or tax year beginning | | , ending | | | | | | | |

Name: **BREAKTHROUGH COATINGS, INC.** / **JULIETA LAROSA**

Taxpayer Identification Number: **82-1526487** / **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**

### Loss Allocated to Stock and Loan Basis

| | Suspended Losses | Current Year Loss | Total Loss | Percent | Allowed Stock Loss | Disallowed Loss | Percent | Allowed Loan Loss | Loss to Carryforward | Total Allowed Loss |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Nondeductible noncap expenses | | | | | | | | | | |
| Deductible items: | | | | | | | | | | |
| Ordinary business loss | | | | | | | | | | |
| Net rental real estate loss | | | | | | | | | | |
| Other net rental loss | | | | | | | | | | |
| Short-term capital loss | | | | | | | | | | |
| Long-term capital loss | | | | | | | | | | |
| Net Section 1231 loss | | | | | | | | | | |
| Other portfolio loss | | | | | | | | | | |
| Other losses | | | | | | | | | | |
| Section 179 expense | | | | | | | | | | |
| Cash contributions (60%) | | 1,465 | 1,465 | 100.00 | | 1,465 | 100.00 | | 1,465 | |
| Cash contributions (30%) | | | | | | | | | | |
| Noncash contributions (50%) | | | | | | | | | | |
| Qual conserv contrib (50%) | | | | | | | | | | |
| Noncash contributions (30%) | | | | | | | | | | |
| Cap gain prop 50% org (30%) | | | | | | | | | | |
| Cap gain prop (20%) | | | | | | | | | | |
| Qual conserv contrib (100%) | | | | | | | | | | |
| Qual cash contribution | | | | | | | | | | |
| Portfolio deductions | | | | | | | | | | |
| Investment interest expense | | | | | | | | | | |
| Deductions-royalty income | | | | | | | | | | |
| Section 59(e)(2) expend | | | | | | | | | | |
| Preproductive period exp | | | | | | | | | | |
| Reforestation expense ded | | | | | | | | | | |
| Other deductions | | | | | | | | | | |
| Foreign taxes | | | | | | | | | | |
| Loss on disposal of 179 assets | | | | | | | | | | |
| Total deductible items | | 1,465 | 1,465 | 100.00 | | 1,465 | 100.00 | | 1,465 | |
| Total nonded and deductible items | | 1,465 | 1,465 | | | 1,465 | | | 1,465 | |

Note to shareholder: This worksheet was prepared based on corporation records. Please consult with your tax advisor for adjustments.



# Case Information

Icon Keys   Summary   Parties   Events   Judgments   Case Options & Payments   Hearings   Financial   File Location   Related Cases

## Judgment Event Information

Show 25 entries                                    Search: 

| Document Index | Judgment Date | Judgment Code | Judgment Description | Instrument Number |
|---|---|---|---|---|
| 50 | 12/07/2022 | NOVDGARN | NOTICE OF DISMISSAL OF WRIT OF GARNISHMENT | |
| 206 | 05/29/2024 | BANK | BANKRUPTCY | |

Showing 1 to 2 of 2 entries                   Previous   1   Next



Indicates document is ready to be viewed

Displays additional event information

Indicates document needs redaction review prior to public viewing

Indicates document is undergoing redaction

Indicates document is sealed by the Court Order or Confidential by Court rule. Image cannot be viewed

Click to purchase electronically certified copies of documents

Image Pending Review

If No Image Appears there is either no image available or document has not been converted to electronic image.

# EXHIBIT E



 

© 2024- Hillsborough County Clerk of Court and Comptroller

Case 8:24-bk-03038-RCT    Doc 66    Filed 12/17/24    Page 116 of 122
*Order Granting in Part, Deferring in Part, Plaintiff's Motion to Strike Pleadings*
CASE NO.: 22-CA-009745

Ms. LaRosa's words, and submissions to the Court, cannot be trusted. The oral ruling of the Court pronounced on February 2, 2024 is incorporated herein and made part of this Order. *See* Hr'g Tr. 314:19-346:19.

WHEREFORE, it is **ORDERED** and **ADJUDGED** as follows:

A.  Defendant LaRosa's defenses are hereby stricken, with prejudice, and default is entered in favor of the Plaintiff and against the Defendant Julieta R. LaRosa as to said pleadings and papers.

B.  By March 5, 2023, Defendant Armstrong shall produce all of Mr. Armstrong's banking and financial records for any and all accounts owned directly or indirectly by him, either as owner, signor, beneficiary or otherwise, wherever the records and accounts may be located, for the time period from November 1, 2021 to the present.[3] The documents shall be produced in unredacted form to counsel for the Plaintiff, Shutts & Bowen, LLP.

C.  Defendant Armstrong is hereby ORDERED to attend an in-person deposition within thirty (30) days of producing all of his banking and financial records to Plaintiff (set forth in paragraph B above), at a time and location to be set by Plaintiff.

D.  Failure of Mr. Armstrong to comply with any provision of this Order, as supported by way of an affidavit of noncompliance by counsel for the Plaintiff, will result in the striking of his pleadings.

E.  Plaintiff is entitled to recover from Ms. LaRosa the Plaintiff's costs and reasonable attorneys' fees incurred in connection with these proceedings. The Court hereby reserves jurisdiction to determine the amount of same.

---

[3] Within 30 days of February 2, 2024, as computed by Rule 2.514.

31

F.      Ms. LaRosa shall return the Apple (iMac) computer[4], to Plaintiff's counsel's Tampa office located at 4301 W Boy Scout Blvd Ste 300, Tampa, FL 33607, no later than February 14, 2024.[5]

G.      Plaintiff is hereby entitled to Final Judgment in Replevin against Ms. LaRosa which will be entered by a separate order.

H.      The Court further reserves jurisdiction to enter such other orders as are necessary to grant full relief to Plaintiff by reason of the wrongful, willful fraud upon this Court which is the subject of these proceedings and this Order.

**DONE AND ORDERED** in Chambers in Tampa, Florida this __ day of February, 2024.

22-CA-009745 2/26/2024 7:57:28 PM
**22-CA-009745 2/26/2024 7:57:28 PM**

_____
HONORABLE PAUL L. HUEY

---

[4] For the avoidance of doubt, this is the Plaintiff's Apple computer which she admitted at the hearing that she has in Defendants' home.

[5] Calculated as within 10 days of February 2, 2024, as computed by Rule 2.514. Consistent with the email sent by my judicial assistant to counsel for Plaintiff and Defendants, after the hearing completed on February 2, 2024.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 6, 2024 a true and correct copy of the foregoing was served via the Florida Courts E-Filing Portal on all counsel and parties of records and the undersigned has effectuated service through the Portal.

**FARROW LAW, P.A.**
*Attorneys for Defendants*
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (954) 252-9818
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: **/s/Jay L. Farrow, Esq.,**
Jay Lewis Farrow, Esquire
Florida Bar Number: 625213

Tanesha W. Blye, Esq.
Florida Bar Number: 0738158
*Of Counsel to Farrow Law Firm*

2

## IN THE CIRCUIT COURT OF THE 13ᵀᴴ JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

BREAKTHROUGH COATINGS, INC.,

      Plaintiff,

v.

CHRISTOPHER R. ARMSTRONG, and
JULIETA R. LAROSA,

      Defendants.

_____/

Case No. 22-CA-009745
DIVISION "I"

## NOTICE OF APPEAL OF NON-FINAL ORDER

**COMES NOW**, Defendants, CHRISTOPHER R. ARMSTRONG and JULIETA R. LAROSA ("Defendant"), by and through undersigned counsel pursuant to Florida Rules of Appellate Procedure 9.130 (a)(3)(c)(ii) and hereby files this Notice of Appeal of the February 26, 2024, <u>Order Granting In Part, Deferring In Part, Plaintiff's Motion to Strike Defendants' Pleadings for Discovery Violations and Other Misconduct</u> in the above-captioned action.

Dated this 6ᵗʰ day of March 2024.

Respectfully submitted,

**FARROW LAW, P.A.**
*Attorneys for Defendants*
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (954) 252-9818
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: **/s/Jay L. Farrow, Esq.,**
Jay Lewis Farrow, Esquire
Florida Bar Number: 625213

Tanesha W. Blye, Esq.
Florida Bar Number: 0738158
*Of Counsel to Farrow Law Firm*

IN THE CIRCUIT COURT OF THE
13TH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.  22-CA-009745

DIVISION "I"

BREAKTHROUGH COATINGS INC.,

      Plaintiff,

v.

CHRISTOPHER R. ARMSTRONG, and
JULIETA R. LAROSA,

      Defendants.

_____/

### ORDER GRANTING IN PART, DEFERRING IN PART, PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' PLEADINGS FOR DISCOVERY VIOLATIONS AND OTHER MISCONDUCT

THIS CAUSE came before the Court for duly noticed evidentiary hearings on January 16, 2024, January 30, 2024, and February 2, 2024 (collectively, the "hearing"), upon Plaintiff's Motion to Strike Defendants' Pleadings for Discovery Violations and Other Misconduct, and Request for Evidentiary Hearing ("Motion to Strike"), and the Court having reviewed the Motion to Strike and accompanying exhibits, the evidence admitted at the hearing, and other matters of record, having heard presentations of Plaintiff, BREAKTHROUGH COATINGS, INC. ("Plaintiff" or the "Company") and Defendants, CHRISTOPHER R. ARMSTRONG ("Mr. Armstrong") and JULIETA R. LAROSA ("Ms. LaRosa") (collectively, Mr. Armstrong and Ms. LaRosa are referred to as, "Defendants"), and being otherwise duly advised in the premises, it is hereby

**ORDERED AND ADJUDGED**, that Plaintiff's Motion to Strike is hereby **GRANTED** as against Ms. LaRosa, and **DEFERRED** as against Mr. Armstrong, for the reasons recited on the

# EXHIBIT F

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2172CV00436

BREAKTHROUGH COATINGS, INC. and,  )
JASON LAROSA, INDIVIDUALLY,        )
      Plaintiffs,                  )
                                   )
                                   )
v.                                 )
                                   )
JULIETA R. LAROSA,                 )
TCCK ENTERPRISES, INC. and         )
MARIE CARMICHAEL,                  )
      Defendants.                  )

### **AFFIDAVIT OF JASON DEXTER LAROSA**

I, JASON DEXTER LAROSA, hereby depose and state as follows:

1.     I am over 18 years of age and legally competent to testify.

2.     The Plaintiff in this case, Jason LaRosa, is my father. The Defendant in this case, Julieta LaRosa is my mother. I have personal knowledge of the facts stated herein.

3.     I understand that my father has made allegations in at least two (2) documents to the court (see Papers 45.1 and 88.1) that my mother "stole money" from my and my brother's payroll accounts. Those allegations are false.

4.     My mother maintained a savings account in my and her names which account was opened when I was still a minor.

5.     In or around December 2021, I agreed to allow my mother to borrow money from that account as a means to help her escape my father's abuse of her and me.

6.     In or around March 2022, with my permission, my mother closed the account.

7.     My mother did not steal from my bank account. I gave her permission to withdraw funds so that she could continue to protect herself from my father.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 19th DAY
OF NOVEMBER 2023.

_Jason_
JASON DEXTER LAROSA

1